Frank AFRICA, Appellant,

v.

The COMMONWEALTH OF PENNSYL-
VANIA Leroy S. Zimmerman (Attorney
General) Bureau of Corrections Ronald
Marks (Commissioner of B.O.C.).

No. 81–2325.

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit Rule
12(6) Sept. 22, 1981.

Decided Oct. 30, 1981.

Rehearing Denied Nov. 24, 1981.

As Amended Jan. 6, 1982.

Albert John Snite, Jr., Asst. Defender,
Defender Association of Philadelphia, Phila-
delphia, Pa., for appellant.

Frank Africa, pro se.

Leroy S. Zimmerman, Atty. Gen., Harris-
burg, Pa., by Mark N. Cohen, Deputy Atty.
Gen., Philadelphia, Pa., for appellees.

Before SEITZ, Chief Judge, and VAN
DUSEN and ADAMS, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

Frank Africa, who claims to be a "Natu-
ralist Minister" for the MOVE organization
and who is a prisoner of the Commonwealth
of Pennsylvania, appeals from a district
court judgment holding that the state
government is not required, under the reli-
gion clauses of the first amendment, to
provide him with a special diet consisting
entirely of raw foods. He maintains that to
eat anything other than raw foods would be
a violation of his "religion." After a care-
ful consideration of the record in this case,
we affirm.

I.

On July 15, 1981, Frank Africa was con-
victed of various state offenses by a Penn-
sylvania court and was sentenced to serve a
term of up to seven years at the State
Correctional Institution at Graterford,
Pennsylvania. Prior to his sentence, Africa

had been incarcerated in Holmesburg Prison, a facility under the jurisdiction of Philadelphia County. While at Holmesburg, Africa requested and received a special diet of uncooked vegetables and fruits.

Africa filed a motion for a temporary restraining order in federal district court on July 16, 1981, seeking an order either that he remain in Holmesburg for the duration of his sentence or that Graterford, upon his transfer there, be required to provide him with his dietary needs. In his pleading for relief, Africa averred that, as a Naturalist Minister for MOVE, "I eat an all raw food diet in accordance with my Religious principle. To eat anything else . . . would be a direct violation of my Religion and I will not violate my Religion for anyone."[1] Africa's motion was assigned to Judge Hannum, who classified the matter as a civil rights action under 42 U.S.C. § 1983.

State authorities transferred Africa from Holmesburg to Graterford on July 17, 1981. Later that same day, at Judge Hannum's request, the Common Pleas Court of Philadelphia entered an order directing that Africa be returned to Holmesburg pending resolution of his request for injunctive relief. Pursuant to that order, Africa was sent back to Holmesburg on July 20 and his special diet was restored.

On July 27, 1981, the district court conducted a hearing on Africa's motion, which was treated as an application for a permanent injunction, and received testimony from Africa himself, Ramona Johnson, a "supporter" of MOVE, and Julius T. Cuyler, the superintendent of Graterford. At the hearing, Africa acted pro se and was questioned directly by the court. Judge Hannum sought to determine, among other things, whether Africa's diet was mandated by his "religion," and, if so, whether the Commonwealth could demonstrate a compelling interest sufficient to infringe upon Africa's dietary practices. Because our disposition of Africa's appeal depends so heavily upon the particular facts of this case, it will be necessary to set forth in some detail

the evidence introduced in the proceeding below.

Based on Africa's testimony and on materials he provided the district court, MOVE is a "revolutionary" organization "absolutely opposed to all that is wrong." MOVE was founded, although the record does not reveal when, by John Africa, who serves as the group's revered "coordinator" and whose teachings Frank Africa and his fellow "family" members follow. MOVE has no governing body or official hierarchy; instead, because "everything is level" and "there are no ups or downs," all MOVE members, including John Africa, occupy an equivalent position within the organization. In fact, MOVE really has only "one member, one family, one body" since, according to Frank Africa, to talk to an individual MOVE "disciple" is to "talk to everybody."

Africa also summarized what he believed to be the tenets that defined the MOVE organization. MOVE's goals, he asserted, are "to bring about absolute peace, . . . to stop violence altogether, to put a stop to all that is corrupt." Toward this end, Africa and other MOVE adherents are committed to a "natural," "moving," "active," and "generating" way of life. By contrast, what they alternatively refer to as "this system" or "civilization" is "degenerating": its air and water are "perverted"; its food, education, and governments are "artificial"; its words are "gibberish." Members of MOVE shun matters "systematic" and "hazardous"; they believe in "using things [but] not misusing things." Thus, according to Africa:

> the air is first, but pollution is second. Water is first, but poison is second. The food is first, but the chemicals that hurt the food are second. . . . We believe in the first education, the first government, the first law. . . . This is the perception that *John Africa* has given us. The water's existence is to be drunk and *not* poisoned, the air's presence is to be breathed and *not* polluted, the food's purpose is to be eaten and *not* distorted.

---

1. To assist the reader, we have corrected mistakes of spelling and punctuation present in

various materials submitted by Mr. Africa to the district court and quoted herein.

The abuse that life suffers MOVE suffers the *same*.

MOVE endorses no existing regime or lifestyle; it yields to none in its uncompromising condemnation of a society that it views as "impure," "unoriginal," and "blemished."

According to Africa, MOVE is a religion. In fact, he insists that "just as there is no comparison between the sun's perfection and the lightbulb's failure, there is no comparison between the absolute necessity of our belief and this system's interpretation of religion." Africa testified that MOVE members participate in no distinct "ceremonies" or "rituals"; instead, every act of life itself is invested with religious meaning and significance. In his words:

> We are practicing our religious beliefs all the time: when I run, when I put information out like I am doing now, when I eat, when I breathe. All of these things are in accordance to our religious belief.... We don't take a date out of the week to practice our religion and leave the other days and say that we are not going to practice our religion ... It is not a one-day thing or a once-a-week thing or a monthly thing. It doesn't have anything to do with time. Our religion is constant. It is as constant as breathing.... Every time a MOVE person opens their mouth, according to the way we believe, according to the way we do things, we are holding church.

Similarly, Africa contends that, since no one day is any more special than another, for MOVE members every day of the year can be considered a religious "holiday."

Africa did not provide the district court with any purportedly official guidelines setting forth MOVE's religious credo. He did submit, however, a document, which he apparently authored, entitled *Brief to Define the Importance of MOVE's Religious Diet*. That document, which Africa asserts is wholly consonant with the teachings of John Africa, sets forth an elaborate explanation of the MOVE philosophical framework and consequently constitutes extremely pertinent evidence for purposes of assessing the nature of the organization. In the *Brief*, Africa contends that "while religion is seen as a way of life, our religion is simply *the* way of life, as our religion in fact *is* life." Individuals who subscribe to the MOVE ideology must live in harmony with what is natural, or untainted:

> Water is *raw*, which makes it *pure*, which means it is *innocent, trustworthy*, and *safe*, which is the same as *God*.... Our religion is raw, our belief is pure as original, reliable as chemical *free* water, ... nourishing as the earth's soil that connects us to food, satisfying as the air that gives breath to all life.

By rejecting the "polluted" and the "fraudulent," and by concentrating instead on the "healthy" and the "original," men and women are put "in touch with life's vibration." Africa asserts that, "when flowing, moving along with the activity of life, ... the less you resist the power that commands this flow the more you become forceful *as* the flow."

Central to this conception of an unadulterated existence is what Africa refers to as MOVE's "religious diet." That diet is comprised largely of raw vegetables and fruits;[2] MOVE members who fully adhere to the diet[3] decline to eat any foods that

---

**2.** *The MOVE Organization's Religious Diet*, a document made available to the district court, explains that the diet desired by MOVE members consists of:

> [r]aw, uncut-unpeeled, unprocessed chemical free sweet potatoes, yams, white potatoes, turnip roots, *all roots* of organic eatable nature, wild rice organic, wild organic garlic, onions, peppers, tomatoes, corn, spinach, raw unopened unprocessed nuts, berries, melons, oranges, peaches, pears, grapes, bananas, apples, organic eggs, raw organic water meats, and some land meats....

Appendix at A–117.

**3.** Africa does not assert that every member of MOVE follows the dietary regimen he describes. In fact, any such assertion would be inconsistent with other evidence contained in the record. Judge Hannum found, after conducting an in-person inspection of the prison at Graterford, that "all MOVE members presently incarcerated are not practicing an alleged MOVE preferred diet." And in *The MOVE Organization's Religious Diet*, it is explained that "there will be members requesting food

have been processed or cooked. "There is nothing unusual or special about our diet," Africa declares in his *Brief*; rather, "our religious diet is common and uncomplicated because our diet is provided by *God* and already *done*." Failure to follow the diet constitutes deviation from the "direct, straight, and true" and results in "confusion and disease." In part, Africa's total commitment to specific provisions appears prudently based, since he asserts that it is "impossible" for an individual's body to adjust to more traditional fare after it has become accustomed to natural foods. But Africa also insists that he is obligated to follow his diet:

> To take away our diet is to leave me to eat nothing, for I have *no* choice, because when given a choice between eating poison and eating nothing, I have no choice but to eat nothing, for I *can't* eat other than raw. This would be *suicidal* and suicide is against life's ministry.

Africa contends that the diet, in conjunction with "our founder's wisdom," transformed him from a weak, timid, and ailing being to a strong, confident, and healthy individual. "Our religious diet is work, hard work, simple consistent unmechanized unscientific self-dependent work," he concludes; "our religious diet is family, unity, consistency, [and] uncompromising togetherness."

Dietary considerations excepted, Africa shed little light upon what, if any, ethical commandments are part and parcel of the MOVE philosophy. In response to specific questioning by the district court, Africa testified that MOVE members would be unable to serve in the armed forces, since "it is impossible for us to defend this system." At the same time, though, he stressed that, from his point of view, there was nothing inconsistent in seeking judicial intervention to prevent his transfer to Graterford:

> We are taught to use anything, anything that is necessary to bring about our purpose. . . . I have to do whatever is neces-

sary to get my point across, to teach people. . . . I am using this system as a bridge to get my purpose to people [and to get] the poor people on my side. "When you are right, you are deserving of protection," Africa declared, "and everything that is in our interest is right."

Africa's discussion of the MOVE organization and its dietary precepts was corroborated by the testimony of Ramona Johnson, a self-labeled "MOVE supporter." Johnson testified that her "brother" was "ordained" as a naturalist minister of MOVE by John Africa, and that he is an ardent follower of his religion and its mandates. Johnson confirmed, but added little to Africa's description of the concerns that lie at the heart of the MOVE ideology. She contended that the MOVE "religion is total; it encompasses every aspect of MOVE members' lives; there is nothing that is left out." And she stressed that Africa's raw food diet is both a necessary "part of" and a sincere "reflection of" his religious commitment. In support of this last observation, Johnson testified that Africa in fact had gone without food for the four day period in July when he was imprisoned at Graterford.

The final witness at the hearing in the district court was Julius T. Cuyler, the superintendent of Graterford. Cuyler testified that his institution was unwilling to meet the dietary needs of Frank Africa. He expressed concern about the possibility of "a proliferation of other groups surfacing in our prison requesting special diets" and warned that, were a court to grant Africa's desired relief, MOVE would attract new "sympathizers." Cuyler contended that the prison's cafeteria already made available to inmates a number of raw foods, such as bananas, apples, and oranges. There were practical reasons, he explained, why Graterford could not be any more accommodating in this regard: it would be "quite a major problem to buy the items that are listed on this diet in the retail market"; the prison's accounting system would be unable to handle such a "major

---

that is not listed in MOVE's religious diet, which is understandable and expected, as everybody in MOVE understands [that] people

coming to MOVE with customs other than MOVE's must run clear of these customs at their own pace." *See* note 5 *infra*.

deviation" in the procurement process; some of the foods asked for by Africa, particularly the potatoes, rice, corn, and berries, if "not kept under strict security, . . . would probably be stolen and used for other purposes," such as to "make home-made booze"; accumulation of raw food might lead to a "rodent problem"; and furnishing special diets might delay the prison's feeding process, with the result that "our entire population will be deprived of just that much of recreation [time]." In short, according to Cuyler, providing Africa with a raw food diet "could be the straw that could break the camel's back."

On August 21, 1981, the district court denied Africa's application for injunctive relief. *Africa v. State of Pennsylvania,* 520 F.Supp. 967 (E.D.Pa.1981). In an opinion accompanying his order, Judge Hannum concluded that, because Africa's sentence was for a period of at least five years, it was not possible, under Pennsylvania law, to grant his request to serve the remainder of his term at Holmesburg.[4] Moreover, Africa had failed to establish that MOVE is "a religion within the purview and definition of the first amendment." On the contrary, according to the district court, "MOVE is merely a quasi-back-to-nature social movement of limited proportion and with an admittedly revolutionary design." As an organization, it is concerned solely with "concepts of health and a return to simplistic living." This the district court found to be more akin to a "social philosophy" than to a religion:

> While MOVE members may respect and respond to religious concepts, these concepts are not subsumed by the MOVE ideology. Rather MOVE exists, as do virtually all other organizations in our society, independent of religion and with separate and distinct purposes while still respecting and abiding by external religious principles.

Consequently, the district court concluded that both Frank Africa and MOVE itself "are not entitled to the first amendment protections and rights respecting the exercise of religion."[5] *Id.* at 970.

Africa immediately appealed the district court's decision to this Court. On August 28, 1981, we ordered that Africa's transfer to Graterford be stayed pending determination of his appeal, which we expedited. In addition, we directed that Albert John Snite, Jr. of the Defender Association of Philadelphia be appointed counsel for Africa for this appeal.

## II.

The relevant case law in the free exercise area suggests that two threshold

---

4. Africa does not question this determination, which was clearly correct, *see* 42 Pa.Const. Stat.Ann. § 9762 (Purdon) (1981).

5. After reaching this determination, the district court proceeded to consider two additional matters. First, relying primarily on Chief Justice Burger's concurring opinion in *Cruz v. Beto,* 405 U.S. 319, 323, 92 S.Ct. 1079, 1082, 31 L.Ed.2d 263 (1972), the court held that even if MOVE were declared a religion, state prison authorities would be under no affirmative duty to provide Africa with his dietary requisites. Although Africa enjoyed the freedom to believe as he wished, he could not assert an absolute right to practice his beliefs while in prison. Second, the court noted that other MOVE members apparently did not follow what Africa claimed was MOVE's religiously mandated diet. *See* note 3 *supra.* From this fact the court concluded that "the MOVE proposed or preferred diet is merely a choice of personal preference" and, as such, did not qualify for special treatment under the first amendment. *Africa*

*v. State of Pennsylvania,* 520 F.Supp. 967, 970–71 (E.D.Pa.1981).

In light of our ultimate resolution of this appeal, it is unnecessary for us to address either of these two "in-the-alternative" determinations. We note, however, that the district court's second conclusion may not be compatible with the Supreme Court's recent observation that "the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect." *Thomas v. Review Bd., Ind. Employment Sec. Div.,* 450 U.S. 707, 715, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624 (1981). And with respect to the district court's first contention, it is observed that the Chief Justice's concern in *Cruz* had to do with the distribution of literature within a prison, and not with the receipt of food by prisoners. A number of courts have been willing to uphold prisoners' religiously based dietary claims. *See e. g., Kahane v. Carlson,* 527 F.2d 492 (2d Cir. 1975); *see generally,* Note, *Free Exercise of Religion in Prisons—The Right to Observe Dietary Laws,* 45 Fordham L.Rev. 92 (1976).

requirements must be met before particular beliefs, alleged to be religious in nature, are accorded first amendment protection. A court's task is to decide whether the beliefs avowed are (1) sincerely held, and (2) religious in nature, in the claimant's scheme of things. *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965); *Callahan v. Woods*, 658 F.2d 679 (9th Cir. Oct. 5, 1981). If either of these two requirements is not satisfied, the court need not reach the question, often quite difficult in the penological setting,[6] whether a legitimate and reasonably exercised state interest outweighs the proffered first amendment claim.

### A.

It is inappropriate for a reviewing court to attempt to assess the truth or falsity of an announced article of faith. Judges are not oracles of theological verity, and the Founders did not intend for them to be declarants of religious orthodoxy.[7] *See*

*United States v. Ballard*, 322 U.S. 78, 85–88, 64 S.Ct. 882, 885–87, 88 L.Ed. 1148 (1944). The Supreme Court has emphasized, however, that "while the 'truth' of a belief is not open to question, there remains the significant question whether it is 'truly held.'" *Seeger, supra*, 380 U.S. at 185, 85 S.Ct. at 863.[8] Without some sort of required showing of sincerity on the part of the individual or organization seeking judicial protection of its beliefs, the first amendment would become "a limitless excuse for avoiding all unwanted legal obligations."[9]

The requirement of sincerity poses no obstacle to Africa in this case. Although the district court made no specific findings in this regard, the Commonwealth never intimated, either at the hearing below or on this appeal, that Africa's convictions, however they might be denominated, were other than deeply held and sincerely advanced. Moreover, we are persuaded from our review of the record that Africa's opinions,

6. *Compare St. Claire v. Cuyler*, 634 F.2d 109 (3d Cir. 1980) *with St. Claire v. Cuyler*, 643 F.2d 103 (3d Cir. 1980) (Adams, J., dissenting from denial of petition for rehearing); *see generally* Comment, *The Religious Rights of the Incarcerated*, 125 U.Pa.L.Rev. 812 (1977). *See also Alim v. Byrne*, 521 F.Supp. 1039, 1045 (D.N.J.1980) (holding that limitations placed upon the religious activities of two prison groups found to be religious organizations were "reasonable under the circumstances").

7. "I cannot give up my guidance to the magistrate; because he knows no more of the way to heaven than I do & is less concerned to direct me right than I am to go right." Jefferson, *Notes and Proceedings on Discontinuing the Establishment of the Church of England* (1776), in I The Papers of Thomas Jefferson 525, 547 (J. Boyd ed. 1950).

8. *Seeger* was a case of statutory interpretation, involving § 6(j) of the Universal Military Training and Service Act, 50 U.S.C.App. § 456(j) (1958 ed.) (requiring belief in "a Supreme Being" in order to qualify for conscientious objector status). We have found no case in which the Supreme Court has explicitly concluded that an inquiry into a claimant's sincerity also is necessary in a constitutional context. Such a requirement, however, plausibly can be inferred from *United States v. Ballard*, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), and a number of lower federal courts have so held. *See Callahan v. Woods*, 658 F.2d 679 (9th Cir. 1981); *Theriault v. Carlson*, 495 F.2d 390, 394–95 (5th Cir.), *cert. denied*, 419 U.S. 1003, 95

S.Ct. 323, 42 L.Ed.2d 279 (1974); *Maguire v. Wilkinson*, 405 F.Supp. 637, 640 (D.Conn.1975). In addition, in two recent decisions, the Supreme Court observed, without commenting upon the significance of its observation, that the religious claim with which it dealt was sincerely held. *Thomas v. Review Bd., Ind. Employment Sec. Div.*, —— U.S. ——, ——, 101 S.Ct. 1425, 1434, 67 L.Ed.2d 624 (1981) ("petitioner terminated his work because of an honest conviction that such work was forbidden by his religion"); *Wisconsin v. Yoder*, 406 U.S. 205, 235, 92 S.Ct. 1526, 1543, 32 L.Ed.2d 15 (1972) ("the Amish in this case have convincingly demonstrated the sincerity of their religious beliefs").

9. L. Tribe, American Constitutional Law 859 (1978). *See Theriault v. Carlson*, 495 F.2d 390, 395 (5th Cir.), *cert. denied*, 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974) (first amendment does not protect "so-called religions which tend to mock established institutions and are obviously shams and absurdities and whose members are patently devoid of religious sincerity"); Giannella, *Religious Liberty, Nonestablishment, and Doctrinal Development: Part I, The Religious Liberty Guarantee*, 80 Harv.L.Rev. 1381, 1417–18 (1967); Comment, *The Religious Rights of the Incarcerated, supra* note 6, at 861 n.306 (sincerity inquiry is "especially important in prison free exercise cases because the bleakness of institutional life may create an incentive falsely to allege religious motivation for acts" otherwise forbidden by prison authorities).

especially those having to do with his diet, are "truly held" within the meaning of *Ballard* and *Seeger*.[10] We turn, therefore, to the second issue: whether Africa's beliefs, however sincerely possessed, are religious in nature.

### B.

Few tasks that confront a court require more circumspection than that of determining whether a particular set of ideas constitutes a religion within the meaning of the first amendment. Judges are ill-equipped to examine the breadth and content of an avowed religion; we must avoid any predisposition toward conventional religions so that unfamiliar faiths are not branded mere secular beliefs. "Religions now accepted were persecuted, unpopular and condemned at their inception." *United States v. Kuch*, 288 F.Supp. 439, 443 (D.D.C.1968). Nonetheless, when an individual invokes the first amendment to shield himself or herself from otherwise legitimate state regulation, we are required to make such uneasy differentiations. In considering this appeal, then, we acknowledge that a determination whether MOVE's beliefs are religious and entitled to constitutional protection "present[s] a most delicate question"; at the same time, we recognize that "the very concept of ordered liberty precludes allowing" Africa, or any other person, a blanket privilege "to make his own standards on matters of conduct in which society as a whole has important interests." *Wisconsin v. Yoder*, 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972).

The Supreme Court has never announced a comprehensive definition of religion for use in cases such as the present one.[11] There can be no doubt, however, that the Court has moved considerably beyond the wholly theistic interpretation of that term expressed in cases such as *Davis v. Beason*, 133 U.S. 333, 342, 10 S.Ct. 299, 300, 33 L.Ed. 637 (1890) (" 'religion' has reference to one's views of his relations to his Creator"). In *United States v. Seeger*, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), the Court recognized as religious for purposes of the Universal Military Service and Training Act an individual's "sincere religious beliefs," even though not theistic in nature, if "based upon a power or being, or upon a faith, to which all else is subordinate or upon which all else is ultimately dependent." 380 U.S. at 176, 85 S.Ct. at 859. A similar "parallel"-belief approach was employed in *Welsh v. United States*, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970), where conscientious objector status was extended to a military conscript even though he declined to profess belief in a Supreme Being. The four Justices in *Welsh* who considered the constitutional question, in addition to the statutory issue, either expressly or implicitly defined religion to include non-theistic ideologies. *Id.* 398 U.S. at 356, 90 S.Ct. at 1804 (Harlan, J., concurring); *id.* 398 U.S. at 367–74, 90 S.Ct. at 1810–14 (White, J., dissenting, joined by Burger, C. J., and Stewart, J.); *see Malnak v. Yogi*, 592 F.2d 197, 205 (3d Cir. 1979) (Adams, J., concurring). And in *Torcaso v. Watkins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961), the Court struck down as a violation of the establishment clause a Maryland statute requiring public officials to declare their belief in God before taking office. Justice Black, writing for a unanimous Court, concluded that a state could not favor "those religions based on a belief in the existence of God as against those religions founded on different beliefs"; in a

---

**10.** There is nothing in the record to indicate that Africa has merely "adopt[ed] religious nomenclature and cynically use[d] it as a shield to protect [himself] when participating in antisocial conduct that otherwise stands condemned," *United States v. Kuch*, 288 F.Supp. 439, 443 (D.D.C.1968), or that MOVE is "a masquerade designed to obtain First Amendment protection for acts which otherwise would be unlawful and/or reasonably disal-

lowed by the various prison authorities but for the attempts which have been and are being made to classify them as 'religious.' " *Theriault v. Silber*, 453 F.Supp. 254, 260 (W.D.Tex. 1978).

**11.** *See Malnak v. Yogi*, 592 F.2d 197, 200–07 (3d Cir. 1979) (Adams, J., concurring); Note, *Toward a Constitutional Definition of Religion*, 91 Harv.L.Rev. 1056, 1057–66 (1978).

footnote, he observed that a number of religious groups within the United States do not hold to theistic doctrines. *Id.* 367 U.S. at 495 & n.11, 81 S.Ct. 1684 & n.11.

Drawing upon these Supreme Court cases, a number of lower federal courts have adopted a broad, non-theistic approach to the definition-of-religion question.[12] In considering a first amendment claim arising from a non-traditional "religious" belief or practice, the courts have "look[ed] to the familiar religions as models in order to ascertain, by comparison, whether the new set of ideas or beliefs is confronting the same concerns, or serving the same purposes, as unquestioned and accepted 'religions.'" *Malnak, supra,* 592 F.2d at 207 (concurring opinion). In essence, the modern analysis consists of a "definition by analogy" approach. It is at once a refinement and an extension of the "parallel"-belief course first charged by the Supreme Court in *Seeger.*

In conducting its inquiry in the case at bar, the district court employed what it referred to as the "inherently vague definitional approach" enunciated in the concurring opinion in *Malnak, supra. Africa v. State of Pennsylvania,* 520 F.Supp. 967, 970 (E.D.Pa.1981). In the *Malnak* opinion, which explicitly adopted the "definition by analogy" process, three "useful indicia" to determine the existence of a religion were identified and discussed. First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.[13] Applying these three factors, the concurring opinion in *Malnak* concluded that the Science of Creative Intelligence-Transcendental Meditation constituted a religion under the first amendment despite the contentions of its leaders to the contrary. After considering Africa's testimony in light of these guideposts, we reach the obverse result: in spite of his protestations, we conclude that MOVE, at least as described by Africa, is not a "religion," in the sense that that term is used in the first amendment.[14]

12. *See Malnak v. Yogi,* 592 F.2d 197, 207 (3d Cir. 1979) (Adams, J., concurring) ("beliefs holding the same important position for members of one of the new religions as the traditional faith holds for more orthodox believers are entitled to the same treatment as the traditional beliefs"); *Founding Church of Scientology v. United States,* 409 F.2d 1146, 1160 (D.C. Cir.1969); *Alim v. Byrne,* 521 F.Supp. 1039 (D.N.J.1980); *Womens Services, P. C. v. Thone,* 483 F.Supp. 1022, 1034 (D.Neb.1979); *Remmers v. Brewer,* 361 F.Supp. 537, 540 (S.D.Iowa 1973). A number of commentators also have recommended a non-theistic definition of religion. *See* L. Tribe, American Constitutional Law § 14–6 (1978) (proposing "arguably religious" test for use in free exercise clause cases); Boyan, *Defining Religion in Operational and Institutional Terms,* 116 U.Pa.L.Rev. 479 (1968); Marcus, *The Forum of Conscience: Applying Standards Under the Free Exercise Clause,* 1973 Duke.L.J. 1217, 1245; Merel, *The Protection of Individual Choice: A Consistent Understanding of Religion Under the First Amendment,* 45 U.Chi.L.Rev. 805, 831 (1978) ("the meaning of 'religion' [may be] minimally objectified by testing a claimant's characterization of his beliefs against a traditionally accepted notion of religion as involving duties and obligations to conform to the standards of a unified belief system that cuts across and directs more than a single aspect of an individu-

al's life"); Comment, *Toward a Constitutional Definition of Religion, supra* note 11, at 1072–83; Comment, *Defining Religion: Of God, the Constitution and the D.A.R.,* 32 U.Chi.L.Rev. 533, 550–51 (1965).

13. *Malnak, supra,* 592 F.2d at 207–10 (concurring opinion). The concurring opinion did not purport to have isolated the only possible factors that could be used to "test" for the presence of a religion. It recognized that "[f]lexibility and careful consideration of each belief system are needed." Still, the opinion stressed that "it is important to have some objective guidelines in order to avoid *ad hoc* justice." *Id.* at 210.

14. In *Malnak,* representatives of the Science of Creative Intelligence-Transcendental Meditation organization opposed designation as a religion in order to continue to teach SCI/TM in certain New Jersey public schools and in order to continue to receive federal funds for that purpose. It is not controlling for our analysis that Africa advances his religious claim under the free exercise clause, whereas *Malnak* involved an establishment clause inquiry. The same standards appear to govern the definition-of-religion determination in both contexts. *Malnak, supra,* 592 F.2d at 210–13 (concurring opinion).

*Fundamental and ultimate questions.* Traditional religions consider and attempt to come to terms with what could best be described as "ultimate" questions—questions having to do with, among other things, life and death, right and wrong, and good and evil. Not every tenet of an established theology need focus upon such elemental matters, of course; still, it is difficult to conceive of a religion that does not address these larger concerns. For, above all else, religions are characterized by their adherence to and promotion of certain "underlying theories of man's nature or his place in the Universe." *Founding Church of Scientology v. United States,* 409 F.2d 1146, 1160 (D.C.Cir.1969).

We conclude that the MOVE organization, as described by Africa at the hearing below, does not satisfy the "ultimate" ideas criterion. Save for its preoccupation with living in accord with the dictates of nature, MOVE makes no mention of, much less places any emphasis upon, what might be classified as a fundamental concern. MOVE does not claim to be theistic: indeed it recognizes no Supreme Being and refers to no transcendental or all-controlling force. Moreover, unlike other recognized religions, with which it is to be compared for first amendment purposes, MOVE does not appear to take a position with respect to matters of personal morality, human mortality, or the meaning and purpose of life. The organization, for example, has no functional equivalent of the Ten Commandments, the New Testament Gospels, the Muslim *Koran,* Hinduism's *Veda,* or Transcendental Meditation's Science of Creative Intelligence. Africa insists that he has discovered a desirable way to conduct his life; he does not

contend, however, that his regimen is somehow morally necessary or required. Given this lack of commitment to overarching principles, the MOVE philosophy is not sufficiently analogous to more "traditional" theologies.

Despite having concluded that MOVE does not deal with "ultimate ideas," we concede that the matter is not wholly free from doubt. Appointed counsel for Africa argues that MOVE members do share a fundamental concern, namely, an all-consuming belief in a "natural" or "generating" way of life—a way of life that ultimately cannot be reconciled with "civilization" itself. According to counsel, Africa's insistence on keeping "in touch with life's vibration" amounts to a form of pantheism, wherein

> the entity of God is the world itself, and God is "swallowed up in that unity which may be designated 'nature'".... [MOVE's] return to nature is not simply a "preferred" state. It is the *only* state. It is the state of being in pure harmony with nature. This, MOVE calls godly. This is pantheism.

Brief for Appellant at 9–11.

We decline to accept such a characterization of Africa's views, however. We recognize that, under certain circumstances, a pantheistic-based philosophy might qualify for protection under the free exercise clause.[15] From the record in this case, though, we are not persuaded that Africa is an adherent of pantheism, as that word is commonly defined.[16] His mindset seems to be far more the product of a secular philosophy than of a religious orientation. His concerns appear personal (*e. g.,* he contends

---

15. It is arguable that the Supreme Court implied as much in *Peter v. United States,* a companion case to *United States v. Seeger,* 380 U.S. 163, 169, 187–88, 85 S.Ct. 850, 855, 864–65, 13 L.Ed.2d 733 (1965). *See Malnak v. Yogi,* 592 F.2d 197, 204 & n.19 (3d Cir. 1979) (Adams, J., concurring).

16. Pantheism is "[t]he religious belief or philosophical theory that God and the universe are identical (implying a denial of the personality and transcendence of God); the doctrine that God is everything and everything is God." 2

Compact Edition of the Oxford English Dictionary 2067 (1971). *See* MacIntyre, *Pantheism,* in 6 Encyclopedia of Philosophy 31, 31, 34 (1967) ("Pantheism is a doctrine that usually occurs in a religious and philosophical context in which there are already tolerably clear conceptions of God and of the universe and the question has arisen of how these two conceptions are related.... Pantheism essentially involves two assertions: that everything that exists constitutes a unity and that this all-inclusive unity is divine").

that a raw food diet is "healthy" and that pollution and other such products are "hazardous") and social (e. g., he claims that MOVE is a "revolutionary" organization, "absolutely opposed to all that is wrong" and unable to accept existing regimes), rather than spiritual or other-worldly. Indeed, if Africa's statements are deemed sufficient to describe a religion under the Constitution, it might well be necessary to extend first amendment protection to a host of individuals and organizations who espouse personal and secular ideologies, however much those ideologies appear dissimilar to traditional religious dogmas.

The Supreme Court would appear to have foreclosed such an expansive interpretation of the free exercise clause. In Wisconsin v. Yoder, the Court concluded that Wisconsin could not require members of the Amish sect to send their children to school beyond the eighth grade, where there was uncontested evidence that such a course was inconsistent with the Amish religion. The Court arrived at this result only after conducting a searching inquiry into the history and customs of the Amish people and into the nature of their religious teachings and practices. In the course of his opinion for the Court, Chief Justice Burger stressed that the objections of the Amish to compulsory secondary education derived from "deep religious conviction[s]" rather than from a "personal" or "secular" philosophy. According to the Chief Justice:

[I]f the Amish asserted their claims because of their subjective evaluation and

rejection of the contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, their claim would not rest on a religious basis. Thoreau's choice was philosophical and personal rather than religious, and such belief does not rise to the demands of the Religion Clauses.

406 U.S at 216, 92 S.Ct. at 1533.[17] Precisely the same distinction had been drawn by the Court in the Seeger and Welsh cases: while an individual could qualify for conscientious objector status on the basis of a genuine "religious belief," reliance upon a "merely personal moral code" was insufficient.

For purposes of the case at hand, then, it is crucial to realize that the free exercise clause does not protect all deeply held beliefs, however "ultimate" their ends or all-consuming their means. An individual or group may adhere to and profess certain political, economic, or social doctrines, perhaps quite passionately. The first amendment, though, has not been construed, at least as yet, to shelter strongly held ideologies of such a nature, however all-encompassing their scope. As the Supreme Court declared in Yoder, "[a] way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation ... if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief." 406 U.S. at 215, 92 S.Ct. at 1533 (emphasis added).[18] While

17. It is possible, of course, to take issue with the Supreme Court's classification of Thoreau-like beliefs as non-religious. See Wisconsin v. Yoder, 406 U.S. 205, 247–49, 92 S.Ct. 1526, 1549–50, 32 L.Ed.2d 15 (1972) (Douglas, J., dissenting in part). It is also possible to dismiss the Court's observations about Thoreau as being unnecessary to dispose of the Yoder case. See Note, Toward a Constitutional Definition of Religion, supra note 11, at 1066 n.63. Nonetheless, in light of Justice Douglas' explicit criticism of the majority opinion on precisely this point, it is difficult to conclude other than that the Amish-Thoreau spectrum represented—and from all indications, still represents—the considered position of a majority of the Court. We therefore follow the framework set forth in Yoder in deciding the present appeal.

18. The task of drawing distinctions between religiously-based and secularly-derived claims in no way entitles or forces a court to assess the truth of the contentions under review. As was observed earlier, the judicial branch is neither authorized nor equipped to pronounce upon the veracity of a religious precept. Unless, however, every individual's subjective definition of a religion is to be controlling in first amendment litigation, "a court must, at least to a degree, examine the content of the supposed religion, not to determine its truth or falsity, or whether it is schismatic or orthodox, but to determine whether the subject matter it comprehends is consistent with the assertion that it is, or is not, a religion." Malnak, supra, 592 F.2d at 208 (concurring opinion).

we do not necessarily agree with the district court's description of MOVE as "merely a quasi-back-to-nature social movement of limited proportion," *Africa, supra,* 520 F.Supp. at 970, we conclude that the concerns addressed by MOVE, even assuming they are "ultimate" in nature, are more akin to Thoreau's rejection of "the contemporary secular values accepted by the majority" than to the "deep religious conviction[s]" of the Amish.

*Comprehensiveness.* The concurring opinion in *Malnak* stressed that a religion must consist of something more than a number of isolated, unconnected ideas. "A religion is not generally confined to one question or one moral teaching; it has a broader scope. It lays claim to an ultimate and comprehensive 'truth.'" 592 F.2d at 209. The Science of Creative Intelligence qualified as a religion, therefore, in part because of its comprehensive nature: its teachings consciously aimed at providing *the* answers to "questions concerning the nature both of world and man, the underlying sustaining force of the universe, and the way to unlimited happiness." *Id.* at 213.

In contrast, we cannot conclude, at least on the basis of Africa's testimony, that MOVE members share a comparable "world view." MOVE appears to consist of a single governing idea, perhaps best described as philosophical naturalism. Apart from this desire to live in a "pure" and "natural" environment, however—a desire which we already have deemed insufficiently religious to qualify for first amendment protection—little more of substance can be identified about the MOVE ideology. It would not be possible, we believe, on the basis of the record in this case, to place Africa's dietary concerns within the framework of a "comprehensive belief system." Expressed somewhat differently, were we to conclude that Africa's views, taken as a whole, satisfied the comprehensiveness criterion, it would be difficult to explain why other single-faceted ideologies—such as economic determinism, Social Darwinism, or even vegetarianism—would not qualify as religions under the first amendment.

Again, we acknowledge that our conclusion in this regard is not unassailable. It could be argued that Africa's views are in a sense comprehensive, since, according to his testimony, his every effort and thought is attributable to and explained by his "religious" convictions. MOVE members, according to Africa, "are practicing our religious beliefs all the time," even when running, eating, and breathing.[19] The notion that all of life's activities can be cloaked with religious significance is, of course, neither unique to MOVE nor foreign to more established religions.[20] Such a notion by itself, however, cannot transform an otherwise secular, one-dimensional philosophy into a comprehensive theological system. It is one thing to believe that, because of one's religion, day-to-day living takes on added meaning and importance. It is altogether different, however, to contend that certain ideas should be declared religious and therefore accorded first amendment protection from state interference merely because an individual alleges that his life is wholly governed by those ideas. We decline to adopt such a self-defining approach to the definition-of-religion problem.

*Structural characteristics.* A third indicium of a religion is the presence of

any formal, external, or surface signs that may be analogized to accepted religions. Such signs might include formal services, ceremonial functions, the existence of clergy, structure and organization, efforts at propagation, observance of holidays and other similar manifestations associated with the traditional religions.

---

**19.** *See* Brief for Appellant at 11 ("MOVE's beliefs are totally consuming, totally directing, and totally uncompromising.... MOVE compels a way of life that cannot be altered by *anything* that a person could subjectively evaluate and decide to follow as a matter of personal preference").

**20.** *See e.g.,* I Corinthians 10:31 ("Whether therefore ye eat, or drink, or whatsoever ye do, do all to the glory of God").

*Malnak, supra,* at 209 (concurring opinion).[21] MOVE lacks almost all of the formal identifying characteristics common to most recognized religions. For example, Africa testified that his organization did not conduct any special services and did not recognize any official customs. Similarly, the group apparently exists without an organizational structure, since MOVE consists of only "one member" and since "everything is level." In this connection, although Africa claimed to be an ordained "Naturalist Minister," he did not make clear what responsibilities and benefits, if any, this title conferred on him in contradistinction to other MOVE members. Moreover, MOVE apparently celebrates no holidays, since it takes the position that every day of the year is equally important. Finally, although Africa referred to a series of guidelines that supposedly were written by John Africa and that allegedly set forth MOVE's principal tenets, no such documents were made available to the district court; thus, the record contains nothing that arguably might pass for a MOVE scripture book or catechism. Given what we know about the group from the record, we are of the view that MOVE is not structurally analogous to those "traditional" organizations that have been recognized as religions under the first amendment.

21. Since "a religion may exist without any of these signs, . . . they [may not be] determinative, at least by their absence, in resolving a question of definition." *Malnak v. Yogi,* 592 F.2d 197, 209 (3d Cir. 1979) (Adams, J., concurring). *See Stevens v. Berger,* 428 F.Supp. 896, 900 (E.D.N.Y.1977) ("Neither the trappings of robes, nor temples of stone, nor a fixed liturgy, nor an extensive literature or history is required to meet the test of beliefs cognizable under the Constitution as religious.")

22. We emphasize that our holding is narrow in scope. We do not hold that MOVE forever must be classified as a purely secular organization. We do not preclude other members of MOVE from establishing, on the basis of other evidence at another time, that they are entitled to the protections afforded by the free exercise clause. Rather, we have focused solely on the description of MOVE made available to the district court by Frank Africa, and have determined only that the set of ideas for which, according to him, that organization stands, does not rise to the level of a religion within the purview of the first amendment.

III.

We conclude first, that to the extent MOVE deals with "ultimate" ideas, a proposition in itself subject to serious doubt, it is concerned with secular matters and not with religious principles; second, that MOVE cannot lay claim to be a comprehensive, multi-faceted theology; and third, that MOVE lacks the defining structural characteristics of a traditional religion. The "new set of ideas or beliefs" presented by Africa does not appear to us to "confron[t] the same concerns, or serv[e] the same purposes, as unquestioned and accepted 'religions,' " *Malnak, supra,* 592 F.2d at 207 (concurring opinion). We hold, therefore, that MOVE, at least as described by Africa, is not a religion for purposes of the religion clauses. We do not conclude that Africa's sincerely-held beliefs are false, misguided, or unacceptable, but only that those beliefs, as described in the record before us, are not "religious," as the law has defined that term.[22]

As the result of our holding in this case, the Commonwealth of Pennsylvania is not required under the first amendment to supply Frank Africa with a special raw-food diet.[23] Such a consequence, however troubling, follows directly from our declaration

23. Our decision in this appeal does not foreclose Africa from challenging, at a later time, the denial of his dietary regimen on other constitutional grounds, particularly the eighth amendment's prohibition against cruel and unusual punishment. While the Commonwealth does not run afoul of the eighth amendment by refusing to provide Africa with what he *wants,* it may do so by refusing to provide him with what he *needs.* According to the testimony below, Africa has followed his special diet for years. It is quite possible, therefore, that any non-raw food provided to him might not be tolerated by his system. In his brief filed with this Court, Africa explains:

To deprive us of our diet is to starve us of our nourishment that is our God-given right, and starvation is cruel, sadistic, and torturous. . . .

This example can be seen clearly in our sister Gail Africa, who has been insensitively denied her diet, and though she still eats cooked food, . . . her body has become sensitive and demanding of our diet, and because of this starvation she is *now* suffering. Her

that MOVE is not a religion. We do not mean to suggest, however, that the requirements of the first amendment also define the proper scope of prudent state penological policy. Especially in light of the apparent willingness of Graterford officials to accede to the dietary requirements of other prisoners, both for religious and for medical reasons,[24] it is not clear from the record why special accommodations cannot be made in this instance for a prisoner who obviously cares deeply about what food he eats. Nonetheless, as a matter of constitutional law, the Commonwealth prevails. Accordingly, the judgment of the district court will be affirmed.

energy is low, her hair that was full is now dry and brittle, her skin that was clear when we last saw our sister is now broken with rash, her teeth have become dulled, and she suffers dizzy spells.... Those of us who eat only raw food *can't* eat anything *but* raw food, for to do otherwise would cause extreme sickness as harmful as *fatal.*

Should Graterford decide not to supply Africa with raw food, and should he become ill as a result, Africa might well be entitled to examination and treatment by a doctor. *See Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) ("deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" [citation omitted]).

24. *See* testimony of Julius T. Cuyler, Appendix at A–91 (altered feeding procedures at Graterford for inmates who participate in annual Ramadan service); Appendix at A–96, A–99 (Graterford provides any special diets ordered by physicians). We also note that the Commonwealth apparently is willing to provide a special raw food diet to female MOVE members incarcerated in the State Correctional Institution at Muncy, Pennsylvania. *See* Clancy, *6 female MOVE prisoners on hunger strike for 33 days,* Philadelphia Inquirer, Oct. 14, 1981, at 1–B, col. 2.