George R. JACQUES and Dennis P. Steo, Plaintiffs,

v.

Gary J. HILTON, William Jamison, Nicholas Gregorio, and Isadore Di Iorio, Defendants.

Civ. No. 78–2393.

United States District Court, D. New Jersey.

Aug. 25, 1983.

George R. Jacques, pro se.

Dennis P. Steo, pro se.

Sharon L. Young, Deputy Atty. Gen., Richard J. Hughes Justice, Trenton, N.J., for defendants.

## OPINION

SAROKIN, District Judge.

Mail order certificates ordaining a person as a minister have acquired a modicum of success recently, since those certificates have been used in an attempt to avoid or reduce taxes. The religious teachings incident to such certificates were never widely held; indeed the originators undoubtedly would be amazed to learn that anyone purported to practice such "religion".

The plaintiffs in this case, however, have chosen to adopt and practice the tenets of the Universal Life Church of California. They have established their own vicinage and wish to practice this religion while confined in a state prison.

It is obvious that every time two or more prisoners join in proclaiming a new religion, they cannot and should not be permitted to hold special meetings, to solicit funds and to partake in unique or expensive diets. The establishment of a new religion while in prison must be viewed with a certain suspicion. On the other hand, one cannot rule out the possibility that the belief in such a religion and the desire to pursue its teachings are sincerely held. Furthermore, while it would be easy to mock such beliefs coupled with mail order ordination certificates, it must be recognized that adherence to religious principles may have a beneficial impact on incarcerated individuals, and therefore, should be encouraged.

Therefore the court is called upon to ponder the imponderable and define the indefinable and determine whether plaintiffs' beliefs and practices constitute a religion.

On October 5, 1978, plaintiffs George R. Jacques and Dennis Steo, who were then inmates at Trenton State Prison, instituted the present action pursuant to 42 U.S.C. § 1983.[1] Plaintiffs alleged, *inter alia,* that defendants, all of whom were prison officials, had denied them the right to practice their religion freely in violation of their rights under the first and fourteenth amendments. Among the activities allegedly interfered with were the collection of donations and the holding of meetings with other prisoners interested in the religion professed. Plaintiffs seek declaratory and injunctive relief and compensatory and punitive damages.

The matter was tried to a jury in July 1982. The jury was unable to determine whether plaintiffs' beliefs constituted a religion and a mistrial was declared. The parties subsequently agreed to submit this question to the court and conceded that it presented a question of law. For the reasons set forth below, the court concludes that the beliefs espoused by the plaintiffs do not constitute a religion within the meaning of the free exercise clause of the first amendment.

## FACTS

Plaintiffs are founders of the United Church of Saint Dennis, ULC, Inc. ["Church" or "Church of Saint Dennis"]. The Church of Saint Dennis is loosely affiliated with the Universal Life Church of California from which plaintiffs obtained mail order certificates ordaining them as ministers. The Church has registered as a charitable institution pursuant to the New Jersey Charitable Fund Raising Act of 1971. There are approximately fifteen members

---

1. Mr. Steo was transferred to Leesburg State Prison on April 30, 1982.

of the Church of Saint Dennis at Trenton State Prison.

The name of the Church was chosen arbitrarily solely as a means of identification; "Saint Dennis" refers to no particular individual, living or dead, mortal or deified. Plaintiffs deny that it was named after the plaintiff, Dennis Steo. The actual beliefs and practices adhered to by members of the Church may be summarized as follows. The Church recognizes the existence of a supernatural force or supreme being referred to as the "Spirit of Life". The Church teaches that each individual possesses a part of the Spirit of Life known as the "essence". In an explanatory pamphlet ("D–2"), Mr. Jacques has described the responsibilities and behavior expected of Church members:

> We are permitted by our belief to Worship, Honor and pay Homage to the Spirit of Life according to our own individual dictates of our conscience, however, we are duty bound to practice our belief that each person has within the essense, and by treating all persons with the respect and dignity we are ourselves endowed with by the presense [sic] of the essense within, and by helping every person to attain spiritual growth, peace and a true understanding of the Spirit of Life through the performance of Good Works and Deeds, thereby bringing about a true understanding of the meaning of God to every person through practice. D–2 at 3.

Mr. Jacques writes further:

> While adhering basically to the tenets advocated by the Mother Church that each individual member is free to make his peace with, honor, worship or pay homage to the Spirit of Life in any manner dictated by his conscience and relationship with the Spirit of Life, as we believe a persons relationship with his maker is a highly personal one, we do require our members to practice our belief that each person has within part of the Spirit of Life through the essence by actual practice in their every day life by treating all persons with the respect and dignity their relationship with the Spirit

of Life through the essense within mandates. We also require our members to be competent, to be proficient, to be humble, to be honest, to be moral, to live positively, to be what we profess, to love our fellow man, to appreciate, to be humble and do charitable works and good deeds within the community. We believe we must live our lives according to above if we are to attain a true understanding of the meaning of the Spirit of Life, spiritual peace within and eternal unification with the Spirit of Life. D–2 at 1–2.

As indicated by these excerpts, a central tenet of the Church of Saint Dennis is the right of each individual to honor any supreme being in any manner consistent with his own conscience and to act in accordance with his individual beliefs, consistent with the mode of behavior set forth above.

Members of other faiths are invited to join the Church of Saint Dennis without regard to past or present religious affiliation. Although the pamphlet describing the Church does not mention holy days or dietary restrictions, Mr. Jacques testified at trial that June 21st, the first day of summer, is observed as the day when all life began. On that day, Church members eat only food from the sea in recognition of the fact that all life originated from the sea. Some meetings of Church members have been held. If plaintiffs were allowed to conduct regular meetings, such meetings would be held weekly. The purpose of Church meetings is to "reconcil[e] any conflict any member may be experiencing in relating their belief and practice of their belief to their every day life." D–2 at 4. No rituals are performed at these meetings and the group does not utilize a Bible or other holy book in its worship.

## LEGAL STANDARD

■ A party seeking first amendment protection for certain beliefs, allegedly religious in nature, must demonstrate that the beliefs are (1) sincerely held and (2) religious in nature in the claimant's scheme of things. *Africa v. Pennsylvania,* 662 F.2d 1025, 1029–30 (3d Cir.), *cert. denied,* 456 U.S. 908, 102 S.Ct. 1756, 72 L.Ed.2d 165

(1981). The truth or falsity of the beliefs averred is not for the court to determine. *Id.* at 1030. The parties have agreed to submit the question of whether the beliefs professed by the plaintiffs are religious in nature to the court for determination as a matter of law. The sincerity with which plaintiffs maintain their beliefs is thus not before the court and will be assumed for the purposes of this opinion.

Mindful of the admonition that "[j]udges are ill-equipped to examine the breadth and content of an avowed religion," *id.* at 1031, the court approaches its task with some trepidation. The court is guided in its inquiry by the principles set forth by the Third Circuit in *Africa v. Pennsylvania.* That matter, also brought under 42 U.S.C. § 1983, involved a prisoner who sought to compel prison officials to provide him with a special diet of raw and natural foods allegedly required by his religion. The professed religion, denominated "MOVE", espoused various revolutionary, nonhierarchical beliefs and rejected most of the products of contemporary society, including its patterns of government and education and its food. Members of MOVE believed that every act of life was imbued with religious meaning and that by concentrating on "the healthy" and "the original", individuals were put "in touch with life's vibrations". *Id.* at 1027.

Finding that plaintiff's beliefs were sincerely held, the Third Circuit identified three "useful indicia", characteristic of accepted religions, against which a belief system may be measured:

> First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.

*Id.* at 1032. (Footnote omitted).[2] In defining these criteria, the court adopted an analysis by analogy approach developed by the Supreme Court in cases dealing with conscientious objectors. *Id.* at 1032; *see generally, United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).

Applying these criteria, the Third Circuit concluded that MOVE, at least as it was described by the plaintiff, was not a religion within the meaning of the first amendment, because the "ultimate ideas" with which it was concerned were largely secular, the movement did not possess a "comprehensive, multifaceted theology" and the movement lacked "the defining characteristics of a traditional religion." *Id.* at 1036.

The court recognizes that the three-part test set forth in *Africa v. Pennsylvania* does not represent the only mode of analysis and that the test must not be used inflexibly or mechanically. *See id.* at 1032 n. 13; *Malnak v. Yogi,* 592 F.2d at 210. Nevertheless, the court finds these criteria to be helpful in resolving this difficult question.

*Fundamental and Ultimate Questions*

■ Ultimate questions are those having to do with, *inter alia,* "life and death, right and wrong, and good and evil." *Id.* at 1033. Generally speaking, religious beliefs flow out of, and embody a sense of a relationship to a supreme being or supernatural force which gives rise to "duties superior to those arising from any human relation." *United States v. Seeger,* 380 U.S. 163, 165, 85 S.Ct. 850, 853, 13 L.Ed.2d 733 (1965) (quoting section 6(j) of the Universal Military Training Act). Traditional religions thus provide a way for man to order his life and adopt coherent positions with respect to matters of "personal morality, human mortality, or the meaning and purpose of life." *Africa v. Pennsylvania,* 662 F.2d at 1033.

The Church of Saint Dennis purports to recognize a supreme being which is denominated the Spirit of Life. There are some references in D–2 to "creator" and "maker" and some mention of the possibility of reunification with the Spirit of Life. Accord-

---

**2.** These criteria were first defined in the concurring opinion of Judge Adams in *Malnak v.* *Yogi,* 592 F.2d 197 (3d Cir.1979).

ing to this document, each individual carries a part of the Spirit of Life within him, the "essence". Despite these cryptic references, the essential nature of this force and its relationship to humankind remains unclear.

The Reverend Ravenall, chaplain at Trenton State Prison, testified that the Spirit of Life was not a Supreme Being. Father Monsignor Tooney testified that he felt that the Church of Saint Dennis espoused a philosophy and a way of life, but that it was not a religion because the way of life it advocated did not center on the worship of a divine being. Although not necessarily binding upon the court, the opinions of individuals who have devoted their lives to religious service are entitled to great weight on this issue. However, plaintiffs' belief systems need not be theistic in nature in order to be afforded the protection of the first amendment. *See Africa v. Pennsylvania,* 662 F.2d at 1032.

The "spirit" which is recognized requires no particular form of worship and imposes no particular code of conduct. Although the Church does espouse a simple code of personal conduct, there is no evidence that adherence to this code is "morally necessary or required". *Id.* at 1033. Certainly, no negative consequences result from not adhering to this code.[3] Moreover, reviewing the evidence as a whole, the court concludes that, despite the profession of a code of conduct, the philosophy of the Church is more accurately described as one of self-determination. For example, the Church is described as offering a "new way of spiritual salvation" derived from the doctrine of the Universal Life Church "which advocates that each person has the privlege [sic] and responsibility to determine what is right as long as it does not infringe on [sic] the rights of others." D-2 at 1. Elsewhere in D-2, the Church is characterized as advocating the "simple doctrine that each and every person should do what is right in God's eyes according to their own personal belief in what is right for them, and the belief that all persons have the right, privlege [sic] and responsibility to worship God in any manner which they belive [sic] to be right." D-2 at 3. Plaintiff Steo testified at trial that each individual is his own guide as to what is right or wrong. Similarly, the testimony of plaintiff Jacques was to the effect that the Church taught that each individual should follow his own conscience in deciding how to act.

Basically, plaintiffs' religion espouses: "Let your conscience be your guide." This cannot constitute a religion in any traditional sense. Self-determination of one's beliefs on an individual basis can scarcely be considered a religion. If that were so, each individual person could constitute a separate religion. Absent some uniformity, some code, some specific concepts, plaintiffs' beliefs do not constitute a religion. The fact that one or more other persons agree that each shall decide and establish his or her own code of conduct and beliefs does not convert this vague guide into a formal religion.

The doctrines of the Church do not address the question of human mortality or the purpose of life at all. To the extent that it addresses questions of personal morality, its position is essentially that any moral code is acceptable. Such a solipsistic point of view is the equivalent of no position at all. Thus, like the MOVE philosophy considered in *Africa v. Pennsylvania,* the Church "does not appear to take a position with respect to matters of personal morality, human mortality or the meaning and purpose of life". *Id.* at 1033. The court concludes that the Church of Saint Dennis is not primarily concerned with the promulgation of "fundamental and ultimate" ideas despite a professed reverence for an all-pervasive, non-human force and the advocacy of a simple code of conduct.

*Comprehensiveness*

Under the facts of this case, there is an obvious relationship between the criterion

---

3. A code of conduct does not necessarily embody ideas which are fundamental and ultimate in a religious sense. Thus, for example, the Boy Scouts and Girl Scouts of America both espouse simple codes of personal conduct but these organizations clearly are not religious.

of comprehensiveness and the existence of fundamental and ultimate ideas. Traditionally, "[A] religion is not generally confined to one question or one moral teaching; it has a broader scope. It lays claim to an ultimate and comprehensive 'truth'". 662 F.2d at 1035, quoting *Malnak,* 592 F.2d at 209. In *Malnak v. Yogi,* the Science of Creative Intelligence was found to be a religion for purpose of the establishment clause "in part because of its comprehensive nature; its teachings consciously aimed at providing the answers to 'questions concerning the nature both of the world and man; the underlying sustaining force of the universe, and the way to unlimited happiness." 662 F.2d at 1035, quoting *Malnak v. Yogi,* 592 F.2d at 213. If a philosophy lacks ideas of this nature, as the court has concluded that the philosophy of the Church of Saint Dennis does, it is difficult for it to meet the requisite standard of comprehensiveness.

In contrast to the Science of Creative Intelligence discussed in *Malnak,* the Third Circuit concluded in *Africa v. Pennsylvania* that MOVE espoused a single governing idea which the court described as philosophical naturalism; "[l]ittle more of substance" could be identified in the ideology. The court found that the "dietary concerns" of the MOVE plaintiff did not constitute "'a comprehensive belief system'". *Id.* at 1035.

As indicated previously, the main characteristics of the religion professed by the plaintiffs in the instant case are an avowed belief in a naturalistic all-pervasive force uniting all living things and a belief in the primacy of the individual conscience. "Little more of substance" can be identified here.

Moreover, the two beliefs of the Church appear to exist without any connection with each other. The belief in the individual conscience, or even the simple moral code espoused by the Church, does not appear to flow inevitably from the nature of the Spirit of Life, nor has any exegesis been provided by the plaintiffs. In describing the comprehensiveness criterion, the Third Circuit stated in *Africa v. Pennsylvania,* that "a

religion must consist of something more than a number of isolated unconnected ideas." *Id.*

Finally, it is difficult to envision how the Church can promulgate an "ultimate and comprehensive truth" or how a "shared world view" can exist when each individual is made the arbiter of his own truth. The adherents of a given religion can generally be identified by certain shared beliefs. As indicated previously, a common belief in the worth of all beliefs, while certainly an admirable philosophy, cannot be said to provide a common spiritual ground.

The court concludes that the Church of Saint Dennis fails to meet the second criterion, because it lacks the comprehensiveness, cohesiveness and commonality of beliefs characteristic of accepted religions.

*Structural Characteristics*

"Neither the trappings of robes, nor temples of stone, nor a fixed liturgy, nor an extensive literature or history is required to meet the test of beliefs cognizable under the Constitution as religious." *Stevens v. Berger,* 428 F.Supp. 896, 900 (E.D.N.Y. 1977), *quoted in Africa v. Pennsylvania,* 662 F.2d at 1036 n. 21. Thus, a belief system which otherwise demonstrates characteristics analogous to those of accepted religions may not be declared non-religious in nature solely because the outward signs of religion are missing. 662 F.2d at 1036 n. 21. Nevertheless, the existence of such indicia as "formal services, ceremonial functions, the existence of clergy, structure and organization, efforts at propagation, observance of holidays and other similar manifestations associated with the traditional religions" may be considered in determining whether the beliefs professed are religious in nature. 662 F.2d at 1035.

Like the MOVE organization described in *Africa v. Pennsylvania,* the Church of Saint Dennis is characterized by few of the formal identifying marks common to most recognized religions. Meetings of church members are not marked by special prayer

or other rituals.[4]  There is conflicting evidence on whether there is an effort to proselytize at the meetings of the Church. Plaintiff Jacques testified that the purpose of such meetings was to discuss the individual beliefs of those attending in order to reconcile the beliefs with those of the plaintiffs.  This testimony is somewhat inconsistent with other testimony and D–2 which emphasizes the belief "that each individual is free to make his peace with honor, worship or pay homage to the Spirit of Life in any manner dictated by his conscience and relationship with the Spirit of Life ...".  The purpose of the Church meetings is portrayed in D–2 as helping prisoners to integrate their beliefs into their daily lives. The court concludes that the primary purpose of Church meetings is for discussion and prisoner self-help and not for propagation of the doctrines of the Church.  There are also no formal ceremonies to mark one's initiation into Church membership or other formal ceremonies related to the professed beliefs of the Church.  (*Cf.* the "puja" ceremony required of a practitioner of the Science of Creative Intelligence as discussed in *Malnak v. Yogi.*)

Although both plaintiffs have been ordained as ministers by the Universal Life Church of California, that ordination was obtained by the simple act of ordering through the mail, and paying for, an ordination certificate.  Plaintiffs undertook no special study or spiritual preparation to prepare them for their roles as religious leaders.  Plaintiff Steo testified that a minister was required to be a decent human being. Plaintiff Jacques testified that a minister of the Church must adhere to the beliefs of the Church.  It is not clear what special duties or responsibilities plaintiffs have assumed within the Church as a result of their ordination.

Other than the descriptive pamphlet D–2, the Church has no holy book, scripture or liturgy.  The Church does celebrate June

21st as a religious holiday and certain dietary restrictions are imposed on that day. On the whole, however, the court concludes that the Church "lacks the defining structural characteristics of a traditional religion."  662 F.2d at 1036.

Based on its examination of the tenets and characteristics of the Church of Saint Dennis in light of the criteria set forth in *Africa v. Pennsylvania,* the court concludes that the beliefs professed by the plaintiffs do not rise to the level of a religion which is entitled to the protection of the first amendment.  Since this conclusion is itself fatal to the plaintiffs' case, there is no need to submit the question of sincerity of the plaintiffs' belief to a second jury.  The court also does not reach the question of whether a legitimate and reasonably exercised state interest justifies the restrictions placed on plaintiffs' activities.  *See Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974).

Accordingly, the motion of the defendants for dismissal of the complaint will be granted.  Counsel for defendants is directed to submit an order in accordance with this opinion.

---

**4.**  Attached to papers submitted by plaintiffs in connection with the present issue before the court is a second descriptive pamphlet which does describe the service of the Church as opening with a short prayer.  This pamphlet

was not a part of the pretrial record in evidence at trial.  It is not certified in any way and the court will not consider it.  Even if the court did consider it, it would not alter the conclusions reached herein.