**UNIFICATION CHURCH, et al., Plaintiffs,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Defendant.**

Civ. A. No. 81–1073.

United States District Court, District of Columbia.

Sept. 16, 1982.

624

David Carliner, Washington, D. C., Larry J. Roberts, William M. Kramer, Barry A. Fisher, Los Angeles, Cal., for plaintiffs.

Daniel S. Friedman, Washington, D. C., for defendant.

## OPINION AND ORDER

JACKSON, District Judge.

### I.

This matter comes before the Court on cross-motions for summary judgment.

Plaintiff Unification Church is a non-profit California corporation known as the "Holy Spirit Association for the Unification of World Christianity" which alleges itself to be an "international religious organization" having its principal office in the United States located in New York. Plaintiff Nikkuni is a Japanese national residing in the U.S. on whose behalf the Unification Church has filed a petition with the Immigration and Naturalization Service for permanent residence in the United States. Plaintiffs Misono and Vanalderwert are Japanese and French nationals, respectively, also residing here, for whom the Unification Church has filed petitions for immigrant visas.[1] Defendant INS is responsible for enforcing the Immigration and Nationality Act, 8 U.S.C., Sections 1101 et seq. Plaintiffs seek review of decisions of the INS denying the individual plaintiffs' applications for status adjustments and orders for their deportation.

The material facts with respect to each of the individual plaintiffs, and with respect to the Unification Church itself, are not in dispute. They appear affirmatively in the administrative records made before the INS, are not contradicted by other evidence of record, and are conceded (with minor semantic caveats) by defendant in its response to plaintiffs' statement of undisputed material facts.

Both Nikkuni's application for permanent resident alien status and Misono's and Vanalderwert's applications for immigrant visas contemplated their employment by the Unification Church. Aliens who enter the U.S. to work may not do so unless the Secretary of Labor has certified that there are not sufficient U.S. workers able, willing, qualified, and available to perform the same labor. 8 U.S.C., Sections 1182(a)(14), 1153(a)(6).[2] The Department of Labor has made a "blanket certification" with respect to certain occupations, including "aliens with a religious commitment who seek admission into the United States in order to work for a non-profit religious organization." 20 C.F.R. 656.10(c)(2) (1982).

*Nikkuni*

Yoko Nikkuni joined the Unification Church in Japan in 1965. She first entered the United States as a 29-year old tourist in November of 1973. Although her lawful presence in this country terminated the following May, she has continued to reside in the United States in the interim, at all times working for and supported entirely by the Unification Church.[3] In July of 1974 she applied for permanent residence to work as a "missionary" for the church. Her application was approved by an INS district director but disapproved on review by the regional commissioner. The Commissioner of INS then remanded for further proceedings, essentially a supplementation of the record, which included Nikkuni's oral testi-

---

1. According to the administrative record Vanalderwert's correct surname is "Vanalderwelt." (A fifth plaintiff, Fumi Asumi (also known as "Azami"), reportedly died March 2, 1982, with her death being first suggested on the record in plaintiffs' memorandum in opposition to defendant's motion for summary judgment on July 10, 1982.)

2. Visa applicants under 8 U.S.C., Section 1153(a)(6), are said to seek "sixth preference" status as aliens "... capable of performing specified skilled or unskilled labor, not of a temporary or seasonal nature, for which a shortage of employable and willing persons exists in the United States."

3. The INS questions, but does not expressly dispute, all the individual plaintiffs' assertions to the same effect.

mony under oath before an INS examiner in October of 1979. On August 15, 1980, a new district director denied the application, certifying the decision, as he had been instructed, directly to the Commissioner for review. On December 15, 1980, the Commissioner affirmed the decision of the district director. On March 2, 1981, Nikkuni's parole pending determination of her application was revoked.[4]

The grounds upon which Nikkuni's application was denied are somewhat protean. In 1977 the regional commissioner who reversed the district commissioner's approval of her application did so because the work to be done by Nikkuni was the same as that required of all members of the denomination and could be described essentially as "proselytism." She could not be described as a "missionary," he said, nor had she demonstrated any "special skills, training and experience" qualifying her for the work to be expected of her. The Commissioner remanded the application to the district director to supplement the record with respect to the nature of the Unification Church itself, stating that it was impossible to ascertain whether Nikkuni possessed the requisite skills, training or experience, or the "religious commitment required of a missionary," because the Unification Church was a "recently organized church of relatively modest proportions in terms of membership in the United States." By August of 1980 the record before the district director had been supplemented with evidence that:

> The Holy Spirit Association for the Unification of World Christianity was founded in Korea in 1954 by Sun Myung Moon when "he received (the revelation of) the Divine Principle;" that the theological doctrine of the Unification Church is based upon the Divine principle which explains man's relationship to God, emphasizes the teaching of Jesus Christ of the necessity to become one with God in love and truth and offers religious solutions to the problems confronting man-

kind; that the doctrine of the Church is set forth in a comprehensive text known as "Divine Principle" and serves as the sacred scripture of the Church, together with the Old and the New Testaments. Religious worship is conducted by the Unification Church in daily prayer sessions in formal morning and evening services on Sundays and in evening worship services on Wednesdays. Such services include prayers, hymns, sermons, and readings from the Old and the New Testaments and from the Divine Principle. The Church also conducts a 5:00 A.M. ceremonial pledge service each Sunday and a monthly prayer service at a designated holy place. Sunday school classes are also conducted for the study of the Divine Principle by the children of the Church members in various Church centers.

> . . . [T]he Holy Spirit Association for the Unification of World Christianity is a worldwide religious movement with missionary activity conducted in 110 countries with established churches in 25 countries, including Australia, Belgium, Brazil, Canada, Denmark, Finland, France, Germany, Great Britain, Guyana, Iceland, Ireland, Japan, Korea, Luxemburg, Malta, Netherlands, New Zealand, Norway, Peru, Portugal, South Africa, Spain, Sweden, and Switzerland, in addition to being established in all 50 states of the United States and the District of Columbia.

> The activities of the Church in the United States, including the selection of church officials, are conducted under the direction of the Board of Directors of the Church, "with guidelines from Church's ecclesiastical leader, Reverend Moon" with implementation of the decisions vested in a national staff and in center directors in approximately 120 cities throughout the United States. Approximately 7,000 members of the Church devote their full-time services to church ac-

---

**4.** Although Nikkuni may be entitled to renew her application *de novo* before an immigration judge in the course of deportation proceedings, the INS has not defended on the ground of a failure to exhaust administrative remedies.

tivities, including teaching, prosyletizing, distributing church literature, and conducting various forms of religious worship. The education and training of missionaries, teachers, and church workers are provided in courses conducted at various training centers, including an international training center maintained at Barrytown, New York. In addition, the Unification Theological Seminary at Barrytown, New York provides a two-year post graduate degree program in religious education.[5]

Notwithstanding that evidence, by applying "criteria" set forth in *Matter of N———*, 5 I & N Dec. 173 (1953),[6] the district director held that the Unification Church was not a "religious denomination within the contemplation of the regulation," because:

> "... there is no formal international structure ... members of [the Church] may belong to other religious denominations ... the officers ministering to its congregations are not ordained and may not legally perform marriages ... [and] all of the functions normally associated with a minister or priest may be performed only by one person ... Reverend Moon."

He thus found it unnecessary to decide whether a missionary for the Unification Church was among those occupations the Secretary of Labor had in mind when he issued his "blanket certification."

The Commissioner affirmed the district director, stating:

Basic to a finding of eligibility ... is a determination that the church in question, the Holy Spirit Association for the Unification of World Christianity or the Unification Church as it is known in the United States, is a religious denomination as contemplated by the regulation.... In denying the application the District Director properly found that the evidence and testimony presented by the applicant concerning the Unification Church differed in several essential respects from the determining criteria.

### Misono and Vanalderwert

The applications filed for the "sixth preference" immigrant visas for Akio Misono and Jean Henri Vanalderwert in May of 1978 describe the work they do for the Unification Church in identical terms:

> Gives personal witness to his faith in God engaging in prosyletizing persons on behalf of the Unification Church. Discusses with persons the concepts of the Church, teaches the Divine Principle, the Church Theology to interested persons to win converts. Counsels those in spiritual need or those contemplating joining the Church. Teaches Sunday School, participates in Sunday Services, may take part in community service programs.

The administrative records disclose that Vanalderwert joined the Unification Church in France in January of 1973 and entered the United States the following September at the age of 23 as a tourist. He has remained since his arrival in the United States at the Unification Church's New York headquarters where his occupation is

---

**5.** The foregoing is a composite of affidavits from the Nikkuni administrative record and is set forth in Paragraph 10 of the plaintiffs' statement of undisputed material facts. Defendant concedes that such evidence was presented and has offered no contradictory evidence, but it questions whether the matters can be said to be "established."

**6.** "A 'religious denomination' is something that has been incorporated under the laws of many of the states in this country; is a worldwide religious organization having a distinct legal existence; a recognized creed and form of worship; a definite and distinct ecclesiastical government; a formal code of doctrine and

discipline; a distinct religious history; a membership not associated with any other church or denomination; officers ministering to their congregation, ordained by a system of selection after completing prescribed courses of training; a literature of its own; established places of religious worship; religious congregations and religious services; a Sunday school for the religious instruction of young; schools for the preparation of its ministers, who in addition to conducting religious services, perform marriage ceremonies, bury the dead, christen children, and advise and instruct the members of their congregations." 5 I & N Dec., at 173.

said to be "church worker." Misono entered the United States in July of 1973 as a 23-year old tourist, having joined the Unification Church in his native Japan four years earlier. Upon his arrival he apparently went immediately to the Unification Church's headquarters in New York where he remained until 1977 when he moved to California. He, too, is a "church worker."

Vanalderwert's application was denied by a district director in November of 1978 and affirmed on appeal by a regional commissioner in September, 1979. He was ordered deported on October 10, 1979, but the record does not reflect whether the deportation took place. Misono's application was denied by a district director in March of 1980, and an appeal to the regional commissioner was dismissed for lack of jurisdiction, leaving the district director's decision as the final decision to be reviewed in this action. The district directors reached identical conclusions that the work description "... in no way distinguishes [the applicant] from the ordinary members of the Unification Church, all of whom engage in these activities," and that "church membership alone" did not satisfy the "religious commitment requirement" necessary for status adjustment. The regional commissioner who denied Vanalderwert's appeal held:

> It is a matter of common knowledge that membership of an organization entails certain inherent responsibilities. In Religious orders, active membership necessarily involves some degree of participation. Many religious orders require its members to fulfill certain assigned tasks. The duties allegedly performed by the beneficiaries in the cases before us are nebulous and general in nature. Their activities, while perhaps performed to advance their religious principles, cannot reasonably be considered as representative of the religious commitment alluded to in 20 C.F.R. 656.10(c)(2), supra. Moreover, their participation as members cannot be equated with the religious commitment identified with recognized professional religious authority. Additionally, active membership in any organization is tantamount only to active enrollment and

does not, standing alone, demonstrate the degree of religious commitment intended by the regulations with which we are here concerned.

## II.

An alien's presence in the U.S. may be, as defendant contends, a matter within the discretion of the INS, but the exercise of that discretion must be grounded upon findings of fact supported by substantial evidence. *Wing Ding Chan v. INS,* 631 F.2d 978, 980–81 (D.C.Cir.1980). And the discretion must not be abused, i.e., be without rational explanation, depart without explanation from established policies, or "rested on an impermissible basis ... or ... other 'considerations that Congress could not have intended to make relevant.'" *Wong Wing Hang v. INS,* 360 F.2d 715, 719 (2nd Cir. 1966), quoting Hand, J., in *United States ex rel. Kaloudis v. Shaughnessy,* 180 F.2d 489, 491 (2nd Cir. 1950).

Whether or not this case represents, as INS suggests, a second attempt by the Unification Church to "legitimate the status of its alien members in this country by judicial action," the earlier case it points to as the first attempt, *Unification Church v. Attorney General,* 581 F.2d 870 (D.C.Cir.), *cert. denied* 439 U.S. 828, 99 S.Ct. 102, 58 L.Ed.2d 122 (1978), does not support its position here. In that case the Unification Church appealed denials of petitions to have alien church members admitted to the United States as non-immigrant "trainees" under 8 U.S.C., Section 1101(a)(15)(H)(iii), ostensibly to be given training as missionaries. In holding that the INS had acted properly in denying the petitions (known colloquially as "H–3 petitions") and in refusing to vacate deportation orders lodged against the so-called "trainees," the Court of Appeals relied upon express record findings by a regional commissioner that the "trainees" were spending most of their energies in fund raising and that there was no *bona fide* missionary training program. The court continued, however, to state:

> We also conclude that the denial of its H–3 petitions did not deprive the Church

of any First Amendment rights. While we agree with appellant that the Attorney General is not vested by statute with the responsibility of imposing standards for the conduct of a religious training program ... we find that the actions of the INS in this case did not amount to such an intrusion. 581 F.2d at 874.

INS cites an unbroken line of Supreme Court cases which has for nearly a century recognized a virtually unlimited power in the political branches of government to make rules for the admission and exclusion of aliens, even such as might be constitutionally repugnant if applied to U.S. citizens. *See Knauff v. Shaughnessy,* 338 U.S. 537, 542–544, 70 S.Ct. 309, 312–313, 94 L.Ed. 317 (1950); *Galvan v. Press,* 347 U.S. 522, 530–532, 74 S.Ct. 737, 742–743, 98 L.Ed. 911 (1954); *Fiallo v. Bell,* 430 U.S. 787, 792–794, 97 S.Ct. 1473, 1477–1479, 52 L.Ed.2d 50 (1977). From those cases it argues that if the sovereign is uninhibited by the constitution when, for example, it declares certain aliens to be undesirable on account of their race, (*The Chinese Exclusion Case,* 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889)), it may to the same extent anathematize one faith or establish another for the same purpose.

■ The INS acknowledges, however, that in enforcing rules respecting the admission of aliens to this country it is exercising the sovereign's delegated power to accomplish the sovereign's purpose, and in this case the "exclusive and unequivocal purpose [of 8 U.S.C., Sections 1182(a)(14) and 1153(a)(6) ] ... is to protect workers in the United States ... from job competition or adverse effects on their wages or working conditions." (Defendant's Memorandum, p. 9). It is difficult to find in that legislative purpose any authority for the INS to establish "criteria" by which religions may be qualitatively appraised, particularly in light of the deference the Establishment and Free Exercise Clauses must be accorded when no issue of alienage

is involved. *See Larson v. Valente,* —— U.S. ——, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). INS officials, no more than judges, are equipped to be "... oracles of theological verity ...," and it is unlikely that either Congress or the Founders ever intended for them "... to be declarants of religious orthodoxy...." even for aliens. *Africa v. Commonwealth of Pennsylvania,* 662 F.2d 1025, 1030 (3rd Cir. 1981). The Court concludes that when Congress permitted an alien's status to turn upon religious considerations it intended that the INS do no more than to determine if the religion in question is *bona fide.* A more invidious use of the government's power over aliens should require more explicit legislative direction.

The task of distinguishing a religion from something else (e.g., a delusion, a personal credo, or a fraud) is a recurring and perplexing problem, and the outer limits of what is "religious" may be ultimately unascertainable. *See Africa v. Commonwealth of Pennsylvania, supra; International Society for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430, 438–441 (2d Cir. 1981); *Founding Church of Scientology v. United States,* 409 F.2d 1146 (D.C.Cir.), *cert. denied,* 396 U.S. 963, 90 S.Ct. 434, 24 L.Ed.2d 427 (1969); *Malnak v. Yogi,* 592 F.2d 197 (3rd Cir. 1979); *United States v. Kuch,* 288 F.Supp. 439 (D.D.C.1968); *Washington Ethical Society v. District of Columbia,* 101 U.S.App.D.C. 371, 249 F.2d 127 (1957); *Theriault v. Silber,* 453 F.Supp. 254 (W.D. Tex.1978).

■ It is unnecessary to search for those limits in Nikkuni's case, however, because upon the administrative record the Unification Church, by any historical analogy, philosophical analysis, or judicial precedent (indeed, by INS' own criteria) must be regarded as a *bona fide* religion.[7]

The Court has similar misgivings about INS' statutory authority to prescribe a particular quantum of faith and the manner in which it must be evinced to satisfy the

---

**7.** The Court of Appeals of New York has reached a similar conclusion. *In the Matter of the Holy Spirit Association for the Unification* *of World Christianity v. The Tax Commission of the City of New York,* 450 N.Y.S.2d 292, 435 N.E.2d 662 (1982).

service that an alien believer is entitled status adjustment even as a matter of grace. More portentous consequences for a U.S. citizen depend merely upon whether his beliefs are "sincerely held and . . . in his own scheme of things, religious." *United States v. Seeger,* 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965). *See Welsh v. United States,* 398 U.S. 333, 356, 90 S.Ct. 1792, 1804, 26 L.Ed.2d 308 (1970).

The INS candidly acknowledges its skepticism of the intentions of Misono and Vanalderwert and points out that nothing would prevent their forsaking their calling immediately (if they have not already done so) to vie with U.S. workers for coveted employment once their petitions are granted. But the Misono and Vanalderwert records are devoid of any evidence whatsoever from which to find or infer that they are not the most devout of people who will continue to serve the Unification Church, as they have since 1973, for an annual remuneration of about $1,800, posing little threat to aspiring U.S. laborers.[8] INS' suspicions cannot substitute for the substantial evidence required to support findings of fact upon which an exercise of administrative discretion must rest, even when applied to aliens.

For the foregoing reasons it is, this 16th day of September, 1982,

ORDERED, that plaintiffs' motion for summary judgment is granted and defendant's motion for summary judgment is denied, and judgment shall be entered accordingly.

---

**8.** INS suggests that if the Court concludes the Unification Church is a religion, a remand of the Nikkuni case for an administrative finding as to whether she possesses the requisite degree of religious commitment would be appropriate. Remand would be superfluous, however, because, if anything, her record demonstrates a devotion more intense than that of Misono and Vanalderwert.