Christof-Andreas LINDENBERG and
Camphill Village, U.S.A.,
Inc., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF JUSTICE, IMMIGRATION & NATU-RALIZATION SERVICE, Defendants.

Civ. A. No. 86–1129.

United States District Court,
District of Columbia.

March 11, 1987.

Thomas A. Elliot, Washington, D.C., and Lawrence H. Rudnick, pro hac vice, Philadelphia, Pa., for plaintiffs.

William J. Dempster, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM

GASCH, District Judge.

## I. INTRODUCTION

This action for declaratory relief is before the Court on cross-motions for summary judgment. Plaintiffs Christof-Andreas Lindenberg and Camphill Village, USA, Inc., seek a determination from this Court that a denial by the Immigration and Naturalization Service ("INS") of a visa petition filed on behalf of Lindenberg was not in accordance with law. Joining the INS as a defendant in this action is the Department of Justice. Defendants seek affirmance of the administrative order accomplishing deportation.

1. All following citations to this Act will refer to the U.S.Code, not to the Act's internal numbering.

2. Plaintiff Lindenberg has been devoted to the Camphill movement for over thirty years. He initiated membership with the Camphill community in 1953. In 1961, he was appointed "service holder" for religious services held at Camphill centers. From 1963 to 1981, he worked, largely in music therapy, at various Camphill Rudolf Steiner Schools throughout Europe. Lindenberg has received no salary for his services at Camphill. His housing and other essential needs have been provided for by the community.

3. Camphill is an international movement founded in 1940 by Dr. Karl Koenig (1902–1966) in

## II. BACKGROUND

Plaintiff Lindenberg was born in Germany and is now a citizen of Great Britain. In November of 1981, the United States first admitted Lindenberg as a temporary worker pursuant to section 1101(a)(15)(H)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* (the "Act").[1] Lindenberg was granted this status for being an individual of "distinguished merit and ability" who planned to live temporarily in the United States upon invitation from a nonprofit organization, namely, Camphill Village.

Since entering the United States in 1981, Lindenberg has rendered services as a teacher and director of music and art therapy and "service holder" of religious services at Camphill Village in Copake, New York.[2] Camphill Village, a member of the Camphill Association of North America, is described by plaintiffs as a nonprofit, nonsectarian, religious organization providing residential therapeutic communities for mentally handicapped children and adults.[3] The bylaws of the Camphill Association indicate that the organization is dedicated to providing human services for the mentally retarded through cooperative life, social interaction and spiritual activity. *See* Plaintiffs' Exhibit A. Based on "anthroposophy," or the teachings of Rudolf Steiner, the Camphill movement is focused toward "Christianizing" the ordinary aspects of life for the mentally handicapped. The bylaws summarize the organization's underlying principles by quoting the following words of Rudolf Steiner:

Aberdeen, Scotland. The movement began with a group of teachers, doctors and artists, many of whom were refugees from Hitler's Germany, who desired to dedicate themselves to the curative and religious education of the mentally handicapped. The premises of their movement were founded on the spiritual and scientific teachings of Rudolf Steiner (1861–1925). Steiner's teachings, known as "anthroposophy," recognized that retarded individuals have needs of body, soul and spirit which affect their development in the same manner as those without mental disorders. *See generally* Richards, *Toward Wholeness: Rudolf Steiner Education in America*, Wesleyan Univ. Press (Administrative Record ("A.R.") at 78).

... in place of what brings quarrel and discord to men, there must come that which can bring the Good to earth ... a Christianizing of ordinary life, a complete Christianizing of the treasures of cosmic wisdom and of the earth's evolution.

*Id.*

The record contains in Lindenberg's own words (from his article in *The Cresset,* the Journal of the Camphill Movement) how he explained the significance of the seasons to those to whom he was seeking to minister:

Christmas and Easter have become symbolic of winter's night and nature's resurrection in spring. Whitsun, the event during early summer, only leads up to the new chord which is much less known as a Christian festival: St. John's, on the 24th of June, makes us remember the birth of the great Christ preparer, the Baptist. With it summer has truly begun and some say it lasts to the day of John's beheading at the end of August and what normally is known as the holidays would thus become the Holy Days of St. John. Not much Christian tradition is connected with this ancient festival but in many places a renewal of the meaning of this festival is attempted.

Least is known about the Christian side of the festival of St. Michael, the Archangel. St. Michael, as the spiritual leader of our age, is also the leader to the Christ impulse in our time. Michaelmas is celebrated on the 29th of September during the harvest season and a great many melodies and songs turn to him asking as it were his aid in the battle which ensues.

These festivals form the main themes of the symphony of the year with its four movements.

A.R. at 211. Eventually they learned a four voice Bach Chorale. Lindenberg explains how he taught his mentally retarded pupils to sing harmony.

In the next two classes it got better. The children wanted to sing. We sang humming songs, question-and-answer songs, and songs related to the subjects of school lessons. Regular time was spent to "get Barry"—and John, and others—"in tune", trying to start on the one and only tone which seemed forthcoming, adding one tone above and one below. The others waited and knew: it is essential that John, for instance, also sings in tune. The joy of being in tune was great. It meant being integrated, tuned in also socially to a big, singing class. No-one would say to you anymore, "You are out of tune, better rather be quiet!"

To sing rounds, in Class 4, also helped social development. To hold a voice against one another and still to achieve harmony together was something worth working for. Listening belonged to the program too, first a short melody on the recorder, later motifs from, for instance, a Handel or Telemann sonata, played on the alto recorder. The lyre accompanied all efforts in learning to listen and to sing.

We learned eventually to sing in different voices, also in different languages. In Class 7 (they were mostly 13–year–olds) we attempted for the first time a 4–voiced Bach Chorale. We learned it in the original German words, whose meaning the children knew. In a free translation it goes as follows:

"What my God wills that shall be done
His will it is the best
To help he is ever ready—those who trust in him
He helps, in need, the good God
and punishes in measure.
Who has faith in him and builds on him
Him—he will never forsake."

A.R. at 222.

On April 23, 1985, Lindenberg filed a visa petition with the INS seeking a "third preference classification" under the Act. *See* 8 U.S.C. § 1153(a)(3) (1978 & 1986 Supp.). Under this classification, visas are made available to qualified immigrants who will substantially benefit the economy, culture or welfare of the United States because they are "members of the professions" or "persons of exceptional ability in the sciences or arts" and their services are sought by a U.S. employer. *Id.* Under the Act, persons seeking this classification

must submit an "alien labor certification" from the Department of Labor ("DOL") as well as a visa petition based upon an offer of employment. See 8 U.S.C. § 1182(a)(14) (1978 & 1986 Supp.); 8 C.F.R. § 204.1(d)(1) (1985). Under the DOL regulations, some aliens are exempted from the individual labor certification requirement and may receive "blanket certification" if they have "religious commitment" and plan to work for a "nonprofit religious organization." 20 C.F.R. § 656.10(c), Schedule A, Group III(2) (1986).

On September 4, 1985, Lindenberg's visa application was denied by the INS District Director in Albany, New York.[4] See Plaintiffs' Exhibit B. That decision found that Lindenberg did not qualify for the Group III(2) exemption because he would be employed as a music therapist, and this is a lay occupation. On March 5, 1986, the Associate Commissioner for INS Examinations dismissed Lindenberg's appeal from the District Director's decision. The Commissioner confirmed the decision below that Lindenberg's position was secular in nature. In addition, the Commissioner found that the Camphill organization was a "nondenominational, nonsectarian institution" not connected with any religious denomination and therefore not included within the meaning of the term "religious organization" in the Group III(2) regulations. See Plaintiffs' Exhibit D.

Lindenberg commenced this suit on April 23, 1986. On June 24, 1986, this Court approved a stipulation remanding the matter to INS to reconsider Lindenberg's eligibility for "precertification" under Schedule A, Group III(2) and to consider whether he may alternatively qualify under Schedule A, Group II. Upon reconsideration, the Associate Commissioner affirmed the findings below on October 14, 1986. See Plaintiffs' Exhibit E. The Commissioner held that, even assuming Camphill could qualify as a nonprofit, religious organization, Lindenberg's occupation of music therapy is typically a secular pursuit and does not constitute "religious work." Additionally,

the Commissioner found that Lindenberg failed to meet the high standards of professional excellence required for Group II certification.

For these reasons, Lindenberg's visa petition has been denied. He now seeks a declaration from this Court that he is entitled to pre-certification under the Group III(2) classification.

## III. DISCUSSION

### A. Jurisdiction

This Court's jurisdiction over the case at bar rests upon 8 U.S.C. § 1329 (1978), which confers jurisdiction to district courts of the United States for all causes arising under Title II of the Immigration and Nationality Act, 8 U.S.C. § 1151 et seq. See Hom Sin v. Esperdy, 239 F.Supp. 903 (S.D. N.Y.1965). Additionally, this Court has general jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiff Lindenberg has exhausted his administrative remedies.

### B. Standard of Review

The defendant correctly asserts that the granting of preference visas is within the sound discretion of the INS. The exercise of that discretion, nonetheless, must be grounded upon findings of fact supported by reasonable substantial and probative evidence on the record considered as a whole. 8 U.S.C. § 1105a (1976). See Wing Ding Chan v. INS, 631 F.2d 978, 980–81 (D.C. Cir.1980), cert. denied, 450 U.S. 921, 101 S.Ct. 1371, 67 L.Ed.2d 349 (1981); Unification Church v. INS, 547 F.Supp. 623, 627 (D.D.C.1982), aff'd, 762 F.2d 1077 (D.C.Cir. 1985). Errors of law by INS may invalidate the agency decision. Kaliski v. District Director, INS, 620 F.2d 214, 216 (9th Cir.1980). Moreover, the discretion of the INS must not be abused, "i.e., be without rational explanation, depart without rational explanation from established policies, or 'rested on an impermissible basis ... or ... other considerations that Congress could not have intended to make relevant.'"

---

4. Apparently, on June 2, 1985, Lindenberg was found deportable by an immigration judge and was granted the privilege of voluntary depar-

ture. No documentation of this decision could be found in the record. But see Defendants' Motion, Statement of Material Facts at ¶ 3.

*Unification Church v. INS*, 547 F.Supp. at 627 (quoting *Wong Wing Hang v. INS*, 360 F.2d 715, 719 (2d Cir.1966)). *See also* Administrative Procedure Act, 5 U.S.C. § 706(2)(A). And, of course, the Court may not substitute its judgment for that of the administrative agency and is limited to an examination of the record to ascertain if discretion has been abused.

### C. *Application of Statutory and Regulatory Scheme*

From the foregoing, it is evident that the agency decision is fatally flawed in the following respects. First, the Commissioner has ruled that Camphill is not a religious organization. His decision and rationale is set forth as Plaintiffs' Exhibit D. It reads as follows:

> Because the organization offering the petitioner/beneficiary employment in this proceeding is a nondenominational, nonsectarian institution, it is concluded the petitioner has failed to establish his employment the immediate past two years has been for a qualifying *religious* organization. Similarly, the petitioner has failed to establish he is seeking to enter the United States for the purpose of working for a *religious* organization. Many non-profit or not-for-profit social agencies espouse non-denominational, nonsectarian philosophical goals, (the Boy Scouts of America, the Daughters of the American Revolution, et cetera), but are not recognized religious organizations affiliated with a specific, identifiable religion. As remarked above, a thorough review of the representations of Camp Hill Village in its capacity as a petitioner before this Service predating the instant petition, fails to evidence any claim by the institution to being a 'religious organization.'

Plaintiffs' Exhibit D at 2 (emphasis in original). Camphill, he concludes, is not a religious organization because it is nonsectarian and nondenominational. It is not affiliated with a specific identifiable religion. This rationale runs counter to a long line of Supreme Court decisions. In *Larson v. Valente*, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), the Court summarized

the principle of law that the government may not require the designation of a particular sect:

> Since *Everson v. Board of Education*, 330 U.S. 1 [, 67 S.Ct. 504, 91 L.Ed. 711] (1947), this Court has adhered to the principle, clearly manifested in the history and logic of the Establishment Clause, that no State can "pass laws which aid one religion" or that "prefer one religion over another." *Id.*, at 15 [67 S.Ct. at 511]. This principle of denominational neutrality has been restated on many occasions. In *Zorach v. Clauson*, 343 U.S. 306 [72 S.Ct. 679, 96 L.Ed. 954] (1952), we said that "[t]he government must be neutral when it comes to competition between sects." *Id.*, at 314 [72 S.Ct. at 684]. In *Epperson v. Arkansas*, 393 U.S. 97 [89 S.Ct. 266, 21 L.Ed.2d 228] (1968), we stated unambiguously: "The First Amendment mandates governmental neutrality between religion and religion.... The State may not adopt programs or practices ... which 'aid or oppose' any religion.... This prohibition is absolute." *Id.*, at 104, 106 [89 S.Ct. at 270, 271], citing *Abington School District v. Schempp*, 374 U.S. 203, 225 [83 S.Ct. 1560, 1573, 10 L.Ed.2d 844] (1963). And Justice Goldberg cogently articulated the relationship between the Establishment Clause and the Free Exercise Clause when he said that "[t]he fullest realization of true religious liberty requires that government ... effect no favoritism among sects ... and that it work deterrence of no religious belief." *Abington School District, supra*, at 305 [83 S.Ct. at 1615].

*Larson, supra*, 456 U.S. at 246, 102 S.Ct. at 1684.

The determination by the Commissioner that Camphill is not a religious organization is the keystone of the structure which comprises the INS decision. In *United States v. Ballard*, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), the Supreme Court reversed a conviction for using the mails to defraud and remanded the case to the Circuit Court with instructions pertinent to the issue with which we are confronted:

Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others. Yet the fact that they may be beyond the ken of mortals does not mean that they can be made suspect before the law.... The Fathers of the Constitution were not unaware of the varied and extreme views of religious sects, of the violence of disagreement among them, and of the lack of any one religious creed on which all men would agree. They fashioned a charter of government which envisaged the widest possible toleration of conflicting views. Man's relation to his God was made no concern of the state.

*Id.* at 86–87, 64 S.Ct. at 886.

 The record as a whole demonstrates convincingly that the Camphill organization is dedicated to serving mentally handicapped children and adults. This habilitation is sought to be achieved by inculcating christianizing principles. The individual plaintiff plays a significant part in this objective by his religion oriented music therapy. When these matters are considered together with the record as a whole, the Court concludes that Camphill is a religious organization and thus within the scope of the applicable regulations.

The second error made by the Service is the misinterpretation of applicable regulations. Section 656.10 of 20 C.F.R. describes two categories of aliens eligible for blanket certification. Subparagraph (c), Group III, reads as follows:

(c) Group III:

(1) Aliens who seek admission to the United States in order to perform a religious occupation, such as the preaching or teaching of religion; and

(2) Aliens with a religious commitment who seek admission into the United States in order to work for a nonprofit religious organization.

Companion regulations specify the documentation necessary for those aliens seeking a labor certification under Group III of Schedule A. These regulations state:

(e) Aliens seeking a labor certification under Group III of *Schedule A* shall file as part of their labor certification applications documentary evidence showing that they have been primarily engaged in the religious occupation or in working for the nonprofit religious organization for the previous two years, and they will be principally engaged (more than 50 percent of working time) in the United States in performing the religious occupation or working for the non-profit religious organization.

20 C.F.R. § 656.22(e) (1986).

Lindenberg's eligibility for this blanket labor certification determines his ability to qualify for a "third preference" visa under the Act. *See* 8 U.S.C. § 1153(a)(3).[5] The Act mandates that third preference immigrant aliens obtain a DOL certification of their occupation. *See* 8 U.S.C. § 1182(a)(14).[6] The purpose behind this la-

---

**5.** The third preference provision reads:

(3) Visas shall next be made available, in a number not to exceed 10 per centum of the number specified in section 201(a)(1) [8 USCS § 1151(a)(1)], to qualified immigrants who are members of the professions or who because of their exceptional ability in the sciences or the arts will substantially benefit prospectively the national economy, cultural interests, or welfare of the United States and whose services in the professions, sciences, or arts are sought by an employer in the United States.

8 U.S.C. § 1153(a)(3) (1986 Supp.).

**6.** This statutory provision states:

(14) Aliens seeking to enter the United States, for the purpose of performing skilled or un-

skilled labor, unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that (A) there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of aliens who are members of the teaching profession or who have exceptional ability in the sciences or the arts), and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed. The exclusion of aliens under this paragraph shall apply to preference immigrant aliens described in section 203(a)(3) and (6) [8 USCS

bor certification requirement is to protect American laborers from foreign competition.

■ The Court finds that the INS decisions below have misconstrued the current Group III(2) regulations by adding a requirement which does not exist therein. The plain language of the Group III(2) provision at 20 C.F.R. § 656.10(c)(2) imposes two specific requirements. First, the alien seeking admission to the United States must have a "religious commitment." Second, that alien must come to this country in order to work for a "nonprofit religious organization." The companion regulations at 20 C.F.R. § 656.22(e) explicitly request documentation showing that, for the previous two years, the alien *either* was engaged primarily in a "religious occupation" *or* in working for a "nonprofit religious organization." Additional documentation must demonstrate that the alien will spend more than 50 percent of his working time in the United States *either* performing a religious occupation *or* working for a nonprofit religious organization. Nothing in these governing regulations mandates that aliens must pursue "religious work" to qualify for Group III(2) classification.[7]

Yet, the INS decisions below repeatedly have insisted that Lindenberg was ineligible for blanket certification under Group III(2) because his occupation as a music therapist was not "religious work." The Court notes that earlier regulations governing the labor certification process in this category did include a provision that the alien's duties must be "related to the religious objectives" of the nonprofit religious organization. *See* 29 C.F.R. § 60.7, Sched-

ule A, Group III (quoted in *Matter of Kjeldaas*, 16 I & N Dec. at 301). However, new regulations, identical to those currently in force, were promulgated by the DOL on January 18, 1977. The new rules expressly rejected exclusion of nonreligious workers from the Group III classification. The DOL afforded an explanation of this change in paragraph number 10 of the published rules:

Some commentors [sic] objected to the exclusion from Schedule A, Group III, of persons with religious commitments who work in non-religious occupations such as nursing and teaching. Group III has been revised to include persons with a religious commitment who will work for non-profit religious organizations.

42 Fed.Reg. 3440, 3440 (January 18, 1977).

In light of this regulatory history, the Court concludes that INS misapplied current regulations by excluding Lindenberg from Group III(2) because of his "non-religious" work. Regardless of whether INS properly concluded that music therapy is necessarily nonreligious in this instance,[8] this Court need not analyze the question any further. No requirement exists in the regulations that Lindenberg perform religious work in order to be eligible for the Group III(2) designation.

■ As stated earlier, the two primary requirements for inclusion in Group III(2) are that the alien have "religious commitment" and that he work for a "nonprofit religious organization." While the present regulation does not define the term "religious commitment," Lindenberg appears to have the requisite commitment. For over

---

§ 1153(a)(3), (6) ], and to nonpreference immigrant aliens described in section 203(a)(7) [8 USCS § 1153(a)(7) ]; ....
8 U.S.C. § 1182(a)(14) (1986 Supp.).

7. Although Groups (1) and (2) of § 656.10(c) are separated by an "and", it is evident from the § 656.22(c) regulations that these are two separate types of aliens either of whom may qualify for blanket certification. The requirements for the two subgroups are not joined, they are disjunctive. This was INS' position in open court and in previous decisions. *See Matter of Kjeldaas*, 16 I & N Dec. 300, 303 (1977).

8. In the October 14, 1986, INS decision, the Associate Commissioner noted that "the overwhelming majority of [music] therapists are employed by non-religious organizations." Plaintiffs' Exhibit E at 2. The Commissioner appears to deduce from this general statement that Lindenberg, therefore, was performing nonreligious work. The record in this case demonstrates that music therapy is integrally connected with the social and religious beliefs of the Camphill movement. This is abundantly clear in the record below considered as a whole. *See, e.g.,* A.R. at 130 *et seq.,* two essays by Dr. Karl Koenig on Camphill.

30 years he has worked with mentally retarded children and adults without any compensation other than a room and the bare necessities of life. He has regularly conducted religious services which include music therapy with the lyre. The Court notes that in many of the Psalms, praising God on the lyre is specifically mentioned. *See* Appendix.

In *Matter of Kjeldaas*, 16 I & N Dec. 300 (1977),[9] the INS found that a woman who taught secular subjects at a school administered by a religious organization called the Jesus People had sufficient religious commitment under the Group III(2) provision. In that case, the agency noted that the regulations were amended to enable nonreligious teachers, among others, to be included in the Group III(2) classification. *Id.* at 303. The agency also recounted that this woman had completed postgraduate work in religious studies and that she had previously taught at a Christian school. Moreover, the agency accepted her testimony that she was religiously motivated in joining the Jesus People and that her occupation as teacher was in furtherance of her faith in God and infused with her "religious perspective." *Id.* at 303–04.

Another significant case on point is *Unification Church v. INS*, 547 F.Supp. 623 (D.D.C.1982), *aff'd*, 762 F.2d 1077 (D.C.Cir. 1985). There, Judge Jackson held that aliens who contemplated employment with the Unification Church, founded by Reverend Sun Myung Moon, were entitled to have their visa applications granted under the DOL blanket certification regulations. The plaintiffs in that case collectively described their work as follows: they prosyletized persons on behalf of their church, they taught the "Divine Principle" to interested persons, they counseled others in spiritual need and participated in Sunday services or community service programs. *Id.* at 626. The length of each plaintiff's membership with the Unification Church varied between nine and seventeen years. Judge Jackson determined that these plaintiffs had adequate "religious commitment"

under the DOL regulations. Moreover, he harbored "misgivings about INS' statutory authority to prescribe a particular quantum of faith and the manner in which it must be evinced...." *Id.* at 628–29. The opinion strongly urged the application of first amendment principles which qualify a U.S. citizen's beliefs as religious if they are "sincerely held and ... in his own scheme of things, religious." *Id.* (citing to *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965); *see also Welsh v. United States*, 398 U.S. 333, 356, 90 S.Ct. 1792, 1804, 26 L.Ed.2d 308 (1970)).

Turning again to the facts of the case at hand, plaintiff Lindenberg has worked for more than 30 years in the Camphill movement which, as stated in its bylaws, seeks to "Christianize" the lives of the mentally handicapped through curative education, social interaction and spiritual activity. In a document entitled "Personal Milestones as a Camphill Community Member," Lindenberg states that upon completing his Camphill training in the mid–1950's, "the religious practices and celebrations of the community became my life's aim." *See* Plaintiffs' Exhibit C at 1. In 1961, Lindenberg was appointed "service holder" for religious services at Camphill centers. Lindenberg asserts that, since then, he has held services regularly and has given religious instruction on a regular basis to retarded children residing in Camphill communities. *Id.* In view of Judge Jackson's opinion and the *Kjeldaas* case, Lindenberg's lifelong devotion to the religious and humanitarian practices of the Camphill movement demonstrates that he possesses adequate religious commitment.

Additionally, the Department of Labor has issued an informal explanation of the term "religious commitment" which would clearly include Lindenberg. Technical Assistance Guide No. 656 for the Labor Certification Program ("TAG") was prepared by the DOL in January 1981 to provide helpful guidelines in the administration of the certification regulations. *See* Plaintiffs' Ex-

---

**9.** The INS has modified this decision, on jurisdictional grounds only, in *Matter of Wiesinger,* 16 I & N Dec. 480 (1978).

hibit F. The document specifically notes that "TAG does not establish substantive requirements beyond those in the regulations." *Id.* at "i". TAG states that

An alien is considered to have a religious commitment if the alien's skills, training, and experience have been and will continue to be used in the furtherance of philanthropic or religious objectives of the religious organization. Membership or a casual attachment to a religious organization is not enough.

The Court concludes that Lindenberg's work with the mentally handicapped over the last thirty years is both "philanthropic," and religious. Thus, he has sufficient religious commitment according to the DOL's own explanation of that term.

The second major requirement is that Lindenberg must have come to the United States to work for a nonprofit religious organization. There seems to be no dispute that Camphill Village is a nonprofit entity.[10] As explained previously, the Court has concluded that Camphill is a religious organization.

█ The remaining question is whether Lindenberg qualifies for a blanket certification. He filed the required petition pursuant to 8 U.S.C. § 1154. He sought classification authorized by 8 U.S.C. § 1153, which makes available visas to "qualified immigrants who are members of the professions" or persons of "exceptional ability in the sciences or the arts" whose presence in the United States will substantially benefit the national economy, culture or welfare of the United States and whose services in the United States are sought by an employer. It is undisputed that Lindenberg's services are sought by the Camphill organization and that he has a continuing offer of employment by that organization. The usual certification from the Labor Department is not required for those designated occupations on Schedule A of the regulations. 20 C.F.R. § 656.10. Thus, a nonprofit religious organization need not obtain an indi-

vidual labor certification to employ a religiously committed alien since Schedule A, Group III(2) provides an exemption in such cases. This application for blanket certification was disapproved by the Buffalo District Office in a decision dated September 4, 1985, on the ground that Lindenberg is simply a music therapist and that music therapy is a lay occupation. This conclusion was reached by the agency based upon the fact that most music therapists perform lay services. It is clear from the record that Lindenberg's activities go far beyond his qualifications as a music therapist. He is a service holder for religious services. He is the house father of the unit in which he lives with the mentally handicapped. He is a teacher not only of the "villagers" who live with the Camphill organization but he is also a teacher as well of other members of the Camphill organization who seek to learn the art of music therapy as it is practiced throughout the Camphill organization both in this country and abroad. He is an integral part of the commendable efforts made by this organization to restore and habilitate the mentally handicapped children and adults who live under the regime of this organization. When Lindenberg was admitted to this country on a temporary visa, he qualified for this exemption. The record discloses nothing to indicate that that decision was misplaced or that he lacked any of the qualifications normally required. According to the record, he has performed in a superb manner with the Camphill organization since he has been in this country. The certifications filed by those familiar with his work bear witness to this fact. They are an eloquent part of this record. The agency seems to brush them aside, saying that they are from people connected with the Camphill organization. Of course, the people who are intimately familiar with Lindenberg's qualifications are Camphill people. The Service also brushes aside the letter supplied by Jonathan Stedall of the British Broadcasting Corporation, which is

---

**10.** The DOL guidelines indicate that a religious organization is nonprofit if the Internal Revenue Service so determines. *See* TAG, Plaintiffs' Exhibit F at 11. A letter by Carlo Pietzner,

President of Camphill Village, USA, Inc., states that the IRS has made such a ruling. *See* Plaintiffs' Exhibit A. This is undisputed.

eloquent testimony of the outstanding qualifications of this man. It reads as follows:

In 1967 I made a BBC documentary film—'In Need of Special Care'—about the work of the Camphill Rudolf Steiner School in Aberdeen. Christof-Andreas Lindenberg was housefather of the unit around which I centred the film. His music therapy classes were also an important ingredient in the film as a whole.

Apart from my own personal admiration and respect for the very fine work that he does—I have kept in touch with Camphill and visited them on several subsequent occasions, the achievement of Mr. Lindenberg and his colleagues was amply acknowledged through the impact and success of the film itself. In 1968 it was awarded the British Film Academy's 'Robert Flaherty Award' and was runner-up for the United Nations Award at the same ceremony. Apart from two major showings on the BBC itself, it was [sic] been seen on television throughout the world; and it has, I believe, inspired many people to become involved in work for the mentally handicapped. The degree to which I was able, however briefly and inadequately, to capture on film the extraordinary pioneering efforts of men like Mr. Lindenberg, was, I am sure, the sole reason for the film's outstanding international success.

I know America quite well through my work as a film maker for the BBC. Mr. Lindenberg could, I am sure, bring something very unique and valuable to that society—as he has done for so many years on this side of the Atlantic.

Plaintiffs' Exhibit A.

■ In conclusion, the Court, applying those requirements that do appear on the face of the Group III(2) regulations, finds for the plaintiffs. First, plaintiff Lindenberg meets the two primary requirements that he have "religious commitment" and that he work for a nonprofit "religious organization." *See* 20 C.F.R. § 656.10(c). Second, Lindenberg satisfies the requirements in the companion regulations since he has worked for a nonprofit religious organization for the prior two years and will spend more than 50 percent of his time in the United States working for this organization. *See* 20 C.F.R. § 656.22(e). Third, a grant of blanket labor certification in this case is in harmony with the purpose of the statute. The statutory mandate that aliens applying for admission to the United States supply the INS with a labor certification was enacted to protect American workers from foreign job competition or from adverse effects on their wages or working conditions. *See Unification Church v. INS*, 547 F.Supp. at 628. No adverse effect on the American labor market would follow from Lindenberg's admission to the United States. He is not paid a salary for his work at Camphill Village, working instead as a volunteer on a subsistence basis. Were his services not available at Camphill, he would not be replaced by a paid American worker.

For the above summarized reasons, and for those covered earlier in this decision, plaintiffs' motion for summary judgment is granted. As a matter of law, plaintiffs are entitled to the declaratory relief that Lindenberg has fulfilled the prerequisites for blanket labor certification under 8 U.S.C. § 1182(a)(14), 20 C.F.R. § 656.10(c), Schedule A, Group III(2), and § 656.22(e). The case is remanded to the Immigration and Naturalization Service for further action consistent with this opinion.

### APPENDIX

Excerpts from The Psalms
*The Jerusalem Bible*

My heart is ready, God,
 my heart is ready;
I mean to sing and play for you,
 awake, my muse,
awake, *lyre* and harp,
 I mean to wake the Dawn!

Psalm 57 (emphasis added).

I promise I will thank you on the *lyre*,
 my ever-faithful God,

I will play the harp in your honor,
Holy One of Israel.

Psalms 71 (emphasis added).

Shout for joy to honor God our strength,
shout to acclaim the God of Jacob!
Start the music, sound the drum,
the melodious *lyre* and the harp;
sound the New Moon trumpet,
at the full moon, on our feast day!

Psalm 81 (emphasis added).

It is good to give thanks to Yahweh,
to play in honor of your name, Most
High,
to proclaim your love at daybreak
and your faithfulness all through the
night
to the music of the zither and *lyre,*
to the rippling of the harp.

Psalm 92 (emphasis added).

Sing to Yahweh, sing to the music of
harps,
and to the sound of many instruments;
to the sound of trumpet and horn
acclaim Yahweh the King!

Psalm 98

Beside the streams of Babylon
we sat and wept
at the memory of Zion,
leaving our harps
hanging on the poplars there.

Psalm 137

Yahweh, who lifts up the humble,
humbles the wicked to the ground.
Sing to Yahweh in gratitude,
Play the *lyre* for our God:
who covers the heavens with clouds,
to provide the earth with rain,....

Psalm 147 (emphasis added).

Alleluia!
Praise God in his Temple on earth,
praise him in his temple in heaven,
praise him for his mighty achievements,
praise him for his transcendent great-
ness!

Praise him with blasts of the trumpet,
praise him with *lyre* and harp,
praise him with drums and dancing,
praise him with strings and reeds,
praise him with clashing cymbals,
praise him with clanging cymbals!

Let everything that breathes praise Yah-
weh!
Alleluia!

Psalm 150 (emphasis added).