**Robert Francis CARPENTER, Plaintiff,**

v.

**Reginald WILKINSON,
et al., Defendants.**

**No. 1:95 CV 0721.**

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 20, 1996.

for purposes of the ADEA. *See Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 273 (7th Cir.1996).

Robert Francis Carpenter, St. Clairsville, OH, Pro Se.

Todd R. Marti, Office of the Attorney General, Corrections Litigation Section, Columbus, OH, for defendants.

### MEMORANDUM OPINION
(Resolving Docket No. 29)

DOWD, District Judge.

Before the Court is the defendants' motion for summary judgment (Docket No. 29),[1] plaintiff's memorandum in opposition (Docket No. 40), and defendants' reply (Docket No. 45). For the reasons discussed below, the motion is granted.

### I. BACKGROUND

On March 28, 1995, *pro se* plaintiff, Robert Francis Carpenter ("Carpenter"), an inmate at Lorain Correctional Institution ("Lor.C.I."), having been previously granted leave to proceed *in forma pauperis,* filed the above-captioned case against (1) Reginald Wilkinson, Director of the Ohio Department of Rehabilitation and Correction ("ODRC"), (2) Norm Rose, Warden of Lor.C.I., (3) Ben Kelly, (4) Chaplain Westra, and (5) Lor.C.I. Publication Screening Committee, alleging violations of his First Amendment right of free exercise of religion and his Fourteenth Amendment right of equal protection.

Plaintiff alleges that he has been "a self proclaimed Satanist" since 1991 and that his beliefs are "deeply rooted." Complaint, ¶ IV(2). He alleges that in 1994 he sought prison officials' permission to receive and keep in his possession a copy of *The Satanic Bible* by Anton S. LaVey,[2] but that permis-

---

1. The motion is supported by a memorandum and a separate appendix, both received on December 1, 1995. A motion to exceed the page limitations set by local rule was filed on November 30, 1995 and granted on December 14, 1995, but apparently the memorandum and appendix were never thereafter officially docketed and filed. The Court has considered these two documents part of the record of this case since it is apparent that the failure to file them was an error on the part of the Clerk, not the defendants.

2. *The Satanic Bible,* published by Avon Books, bears a 1969 copyright. A complete copy of *The Satanic Bible* is found at Exhibit A to plaintiff's deposition. Plaintiff testified that the book

sion was ultimately denied after the book was reviewed by prison and ODRC officials.

Carpenter asserts that *The Satanic Bible* plays a role in Satanism analogous to the *Holy Bible* in Christianity and the *Koran* in Islam. Carpenter Depo., pp. 15–16, 22. Prison officials, however, denied permission for Carpenter to keep the book because (1) "Satan worship is not [an] authorized religion with the [ODRC]" and (2) because they found the book to be "inflammatory." Carpenter Depo., Exhibits C, J and L. This lawsuit resulted.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). However, the adverse party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

The Rule requires the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes. *See Lujan v. National Wildlife Federation,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts ... earlier deposition testimony." *Reid v. Sears Roebuck & Co.,* 790 F.2d 453,

460 (6th Cir.1986) (citing *Biechele v. Cedar Point, Inc.,* 747 F.2d 209, 215 (6th Cir.1984)). Further, " '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. at 2511.

## III. DISCUSSION

In their motion for summary judgment, defendants advance these arguments: (1) that Satanism is not a "religion" for First Amendment purposes, but that if it is a religion, defendants have not substantially burdened plaintiff's ability to practice that religion; and (2) that defendants have legitimate penological reasons both for distinguishing between Satanism and other religions and for barring *The Satanic Bible* from Ohio's prisons.

### A. The First Amendment Claim

■ In *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the Supreme Court set forth the principles that guide a court's analysis of a claimed violation of the constitutional rights of a person who is incarcerated. The first principle is that, even where the claimant is incarcerated, federal courts must "discharge their duty to protect constitutional rights." *Id.* at 405–406, 94 S.Ct. at 1807–08 (citing *Johnson v. Avery,* 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969)). The second principle is the recognition that a fair amount of deference should be accorded prison authorities because "courts are ill equipped to deal with the increasingly urgent problems of prison

marked as Exhibit A is the same book at issue in

this lawsuit. Carpenter Depo., pp. 15–16.

administration." *Id.* at 405, 94 S.Ct. at 1807. Therefore, when a prison policy is alleged to violate an inmate's constitutional rights, the policy will be judged valid "if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). *See also O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).[3]

Thus, the analysis in this case must first address whether the plaintiff is experiencing a deprivation of his First Amendment right to religious free expression. If he is, then the Court must determine whether the deprivation is rendered valid by a legitimate penological interest.

█ The Supreme Court has set forth two requirements which must be met before a person's beliefs are entitled to First Amendment protection: (1) the beliefs must be sincerely held, and (2) the beliefs must be, in the claimant's scheme of things, religious in nature. *United States v. Seeger,* 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965) (a case involving conscientious objection to military service on the basis of religious training and belief). If either of these requirements is not met, a court need not reach the question of whether a legitimate penological interest outweighs the exercise of the First Amendment right because there is simply no "free exercise" to protect. The *Seeger* Court noted that in conducting the analysis courts "are not free to reject beliefs because they consider them "incomprehensible." *Id.* In other words, courts may not inquire into the "truth" of a belief alleged to be religious. There is, however, no prohibition against inquiring into whether a set of beliefs constitutes a "religion" within the meaning of the First Amendment. *Jones v. Bradley,* 590 F.2d 294, 295 (9th Cir.1979).

For purposes of this motion, the Court will assume that Carpenter's beliefs as a Satanist are sincerely held. This assumption is supported both by the Complaint where he states that his beliefs are "deeply rooted," Complaint, ¶ IV(2), and by several affidavits of fellow prisoners who testify that it is a known fact in the prison that Carpenter is a Satanist. Affidavits of Robert Minniefield, Eric Scott Ryhal, Michael Hamilton, and John Epps.[4]

Having assumed the sincerity of Carpenter's beliefs, the Court must turn to the question of whether, in the plaintiff's scheme of things, his beliefs are religious in nature. Deciding what is "religious" or what constitutes a "religion" is a very delicate undertaking, especially where the claimed "religious" beliefs fall outside what is commonly thought of as mainstream religion. At the same time, "the very concept of ordered liberty precludes allowing [a plaintiff] or any other person, a blanket privilege to make his own standards on matters of conduct in which society as a whole has important interests." *Africa v. Commonwealth of Pa.,* 662 F.2d 1025, 1031 (3d Cir.1981) (internal quotation marks omitted), *cert. denied,* 456 U.S. 908, 102 S.Ct. 1756, 72 L.Ed.2d 165 (1982) (quoting *Wisconsin v. Yoder,* 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972)).

The First Amendment, although it protects religious belief, does not itself define "religion." Therefore, the Court must turn to case law for guidance. Early Supreme Court precedent defined religion in traditional theistic terms. *See, e.g., Davis v. Beason,* 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890); *see also Malnak v. Yogi,* 592 F.2d 197, 201 (3d Cir.1979) (Adams, J.; concurring). Over the years, case law broadened to protect unorthodox and non-theistic beliefs. *See, e.g., Torcaso v. Watkins,* 367 U.S. 488, 495 n. 11, 81 S.Ct. 1680, 1683 n. 11, 6 L.Ed.2d 982 (1961) (identifying religions in this coun-

---

**3.** On November 16, 1993, Congress passed the Religious Freedom Restoration Act ("RFRA"), codified at 42 U.S.C. § 2000bb, *et seq.* Although free exercise claims of prisoners are within the coverage of the Act, plaintiff brought his claim only under 42 U.S.C. § 1983, alleging a violation of the First Amendment by persons acting under color of state law. Therefore, the Court's analysis shall appropriately apply the "reasonableness" standard set forth in *O'Lone,* since this

standard "continues to have vitality for claims brought directly under the First Amendment[,]" *Jolly v. Coughlin,* 76 F.3d 468 (2d Cir.1996), as opposed to under RFRA.

**4.** These affidavits are located in the Appendix to plaintiff's memorandum in opposition to the motion for summary judgment. (Docket No. 40).

try which do not teach belief in the existence of God); *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 658–59, 63 S.Ct. 1178, 1194–95, 87 L.Ed. 1628 (1943) (Frankfurter, J.; dissenting) (religion may be regarded "as a response of the individual to an inward mentor"). In *Seeger, supra,* considering eligibility for conscientious objection to military service, the Court defined "religion" by comparing less traditional belief systems to faiths clearly within the scope of the First Amendment. Thus:

> [w]hile the applicant's words may differ, the test is simple of application. It is essentially an objective one, namely, does the claimed belief occupy the same place in the life of the objector as an orthodox belief in God holds in the life of one clearly qualified for exemption?

*Seeger,* 380 U.S. at 184, 85 S.Ct. at 863. *See also Welsh v. United States,* 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970) (granting conscientious objector status to a military conscript even though he declined to profess belief in a Supreme Being).

The Third Circuit has identified three "useful indicia" for determining the existence of a religion protected by the First Amendment:

> First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.

*Africa v. Comm. of Pa.,* 662 F.2d at 1032 (citing *Malnak, supra* ).

The nature of the inquiry regarding "fundamental and ultimate questions" was described by the *Africa* court as follows:

> Traditional religions consider and attempt to come to terms with what could best be described as "ultimate" questions—questions having to do with, among other things, life and death, right and wrong, and good and evil. Not every tenet of an established theology need focus upon such elemental matters, of course; still, it is difficult to conceive of a religion that does not address these larger concerns.

For, above all else, religions are characterized by their adherence to and promotion of certain "underlying theories of man's nature or his place in the Universe." *Founding Church of Scientology v. United States,* 409 F.2d 1146, 1160 (D.C.Cir.1969).

*Africa,* 662 F.2d at 1033.

Regarding the second criterion, that is, comprehensiveness, the *Africa* court expounded as follows:

> [A] religion must consist of something more than a number of isolated, unconnected ideas. A religion is not generally confined to one question or one moral teaching; it has a broader scope. It lays claim to an ultimate and comprehensive truth.

*Id.* at 1035 (internal quotation marks and citation omitted).

Finally, in discussing the aspect of formal structure as a defining characteristic of "religion," the *Africa* court pointed to the presence of

> any formal, external, or surface signs that may be analogized to accepted religions. Such signs might include formal services, ceremonial functions, the existence of clergy, structure and organization, efforts at propagation, observance of holidays and other similar manifestations associated with the traditional religions.

*Id.* at 1035–1036 (quoting *Malnak,* 592 F.2d at 209 (concurring opinion)). The court noted, however, that "[n]either the trappings of robes, nor temples of stone, nor a fixed liturgy, nor an extensive literature or history is required to meet the test of beliefs cognizable under the Constitution as religious." *Id.* at 1036 n. 21 (quoting *Stevens v. Berger,* 428 F.Supp. 896, 900 (E.D.N.Y.1977)).

The defendants argue that Satanism, as set forth in *The Satanic Bible,* meets none of the three criteria. Specifically, they assert that Satanism does not address the meaning of life and death, the relationship between human beings and nature, or the boundaries of good and evil. Rather than setting any fixed code of personal morality, defendants argue, Satanism's only unifying principle is a form of "do as you please." They assert that

Satanism lacks a comprehensive, unified way of dealing with the universe or ordering one's life, presenting instead only a single theme of self-gratification. Finally, they argue that Satanism lacks most of the structural characteristics of belief systems accorded religious status for First Amendment purposes.

The Court has perused *The Satanic Bible* and does not reach precisely the same conclusion as the defendants.[5] Although Satanism addresses fundamental questions in an unconventional manner, it does address them. For example, Satanism does not deny the existence of God. It states:

> It is a popular misconception that the Satanist does not believe in God. The concept of "God," as interpreted by man, has been so varied throughout the ages, that the Satanist simply accepts the definition which suits him best.... To the Satanist "God"—by whatever name he is called, or by no name at all—is seen as the balancing factor in nature, and not as being concerned with suffering. This powerful force which permeates and balances the universe is far too impersonal to care about the happiness or misery of flesh-and-blood creatures on this ball of dirt upon which we live.

*The Satanic Bible,* p. 40. With respect to right and wrong, good and evil, and relationships between people, it states:

> ... It is unnatural not to have the desire to gain things for yourself. Satanism represents a form of controlled selfishness. This does not mean that you never do anything for anyone else. If you do something to make someone for whom you care happy, his happiness will give you a sense of gratification.
>
> Satanism advocates practicing a modified form of the Golden Rule. Our interpretation of this rule is: "Do unto others as they do unto you[.]"

*Id.* at 50–51. On the topic of love and hate, *The Satanic Bible* instructs:

> You cannot love everyone; it is ridiculous to think you can. If you love every-

one and everything you lose your natural powers of selection and wind up being a pretty poor judge of character and quality. If anything is used too freely it loses its true meaning. Therefore, the Satanist believes you should love strongly and completely those who deserve your love, but never turn the other cheek to your enemy!

*Id.* at 64. Although this is contrary to the teaching of the "Golden Rule" of many traditional religions, it is clearly a teaching about how one should order one's life in relationship to others.

Satanism claims to have "dogmas," of a sort. In discussing the "new state of [intellectual] awareness" brought about by modern psychiatry, *The Satanic Bible* notes:

> ... The one need psychiatry cannot fill is man's inherent need for emotionalizing through dogma. Man needs ceremony and ritual, fantasy and enchantment. Psychiatry, despite all the good it has done, has robbed man of wonder and fantasy which religion, in the past, has provided.
>
> Satanism, realizing the current needs of man, fills the large grey void between religion and psychiatry. The Satanic philosophy *combines* the fundamentals of psychology *and* good, honest emotionalizing, or dogma. It provides man with his much needed fantasy. There is nothing wrong with dogma, providing it is not based on ideas and actions which go completely against human nature.

*Id.* at 53.

Contrary to defendants' argument that Satanism does not even refer to itself as a "religion," but rather a "fantasy," *The Satanic Bible* states:

> ... The basics of Satanism have always existed. The only thing that *is* new is the formal organization of a religion based on the universal traits of man. For centuries, magnificent structures of stone, concrete, mortar, and steel have been devoted to man's abstinence. It is high time that human beings stopped fighting themselves,

---

**5.** The Court acknowledges that the defendants have quoted extensively from *The Satanic Bible.* Although the quotations are completely accurate, they are obviously selected for their ability to

support the defendants' position that Satanism is not a religion, but rather a form of hedonism. The Court, however, has found other quotations which seem to be more useful to the analysis.

and devoted their time to building temples designed for man's indulgences.

... So, why not have a religion based on indulgence? Certainly it is consistent with the nature of the beast. We are no longer supplicating weaklings trembling before an unmerciful "God" who cares not whether we live or die. We are self-respecting, prideful people—we are Satanists!

*Id.* at 53–54.

The teaching of Satanism on the topic of life and death is that "life after death [is attained] through fulfillment of the ego."

Death, in most religions, is touted as a great spiritual awakening—one which is prepared for throughout life. This concept is very appealing to one who has not had a satisfactory life; but to those who have experienced all the joys life has to offer, there is a great dread attached to dying. This is as it should be. It is this lust for life which will allow the vital person to live on after the inevitable death of his fleshy shell.

*Id.* at 91–92.

Satanism celebrates three major holidays: one's own birthday, Walpurgisnacht (May 1st), and Halloween. Solstices and equinoxes are also holidays. *Id.* at 96–98.

Satanism does have rituals. Most non-Satanists commonly think of the "black mass," described as follows in *The Satanic Bible*:

Any ceremony considered a black mass must effectively shock and outrage, as this seems to be the measure of its success. In the Middle Ages, blaspheming the holy church was shocking. Now, however, the Church does not present the awesome image it did during the inquisition. The traditional black mass is no longer the outrageous spectacle to the dilettante or renegade priest that it once was. If the Satanist wishes to create a ritual to blaspheme an accepted institution, for the purpose of psychodrama, he is careful to choose one that is not in vogue to parody. Thus, he is truly stepping on a sacred cow.

*Id.* at 101. *The Satanic Bible* actually defines only three types of rituals: a sex ritual, a compassion ritual, and a destroying ritual. These rituals are described as follows:

A sex ritual is what is commonly known as a love charm or spell. The purpose in performing such a ritual is to create desire on the part of the person whom you desire, or to summon a sex partner to fulfill your desires.

\* \* \* \* \* \*

The compassion, or sentiment, ritual is performed for the purpose of helping others, or helping oneself. Health, domestic happiness, business activities, material success, and scholastic prowess are but a few of the situations covered in a compassion ritual.

\* \* \* \* \* \*

The third motivating force is that of destruction. This is a ceremony used for anger, annoyance, disdain, contempt, or just plain hate. It is known as a hex, curse, or destroying agent.

*Id.* at 114–115. *The Satanic Bible* contains a section which sets forth notes to observe before a Satanic ritual, the thirteen steps for performing a Satanic ritual, and devices used in a Satanic ritual. *Id.* at 129–140. It also contains several sections on "invocations" for various rituals, *Id.* at 144–152, and a translation of the magical language used in Satanic rituals, *Id.* at 155–272.

As already noted, deciding what beliefs rise to the level of a "religion" for First Amendment purposes is a very delicate undertaking, especially where the "religion" sought to be protected is not one of the mainstream or traditional ones. Here, having cursorily reviewed *The Satanic Bible* which plaintiff asserts sets forth the tenets of his "religion," the Court need only comment that Satanism *appears* to have at least some of the indicia of a religion. The Court need not, however, definitively decide the question of whether Satanism is a religion. The Court will presume for the sake of this motion only that Satanism is a religion the practice of which is protected by the First Amendment. Such presumption will permit and require that the Court proceed to the final step of the analysis, namely, whether there is any legitimate penological reason for

the defendants' refusal to allow plaintiff to receive and keep in his possession a copy of *The Satanic Bible*.

The ODRC has no specific policy against the belief by inmates in the "religion" of Satanism. Karlen Aff., ¶ 5.[6] However, it does not allow inmates to pursue religious practices that threaten institutional security. *Id.*, ¶ 3. Therefore, it has at times restricted or prohibited the possession of "religious" literature which it finds to be inflammatory. *Id.*[7] In this case, although the ODRC's Publication Screening Committee had recommended that *The Satanic Bible* be permitted, ODRC Director Reginald Wilkinson overruled the recommendation, stating that "pp. 87, 88 on human sacrifice is [sic] inflammatory."[8] Although Director Wilkinson's notation is specific as to particular pages that are deemed inflammatory, leading one to believe that a suitable accommodation might have been to merely cut out those two pages, the official ruling is not that specific, stating that the entire publication was inflammatory.[9]

■ The Court ordinarily must defer to the institution's decisions regarding the appropriateness of policies and practices. Here, no deference is necessary because the Court is in complete agreement that large portions of *The Satanic Bible* have great potential for fomenting trouble of all kinds in a prison setting, leading to difficulty in maintaining security and order and in delivering rehabilitative services in the prisons. In addition, much of the publication advocates preying on the weak in any way possible for one's own gratification—clearly an extremely dangerous "teaching" in *any* setting, but especially in a prison where the weak have fewer avoidance strategies at their disposal. A few examples of isolated quotations will suffice to illustrate the point. *The Satanic Bible* states:

Hate your enemies with a whole heart, and if a man smite you on one cheek, SMASH him on the other!; smite him hip and thigh, for self-preservation is the highest law! (p. 33, emphasis in original).

Give blow for blow, scorn for scorn, doom for doom—with compound interest liberally added thereunto! Eye for eye, tooth for tooth, aye four-fold, a hundredfold! Make yourself a Terror to your adversary, and when he goeth his way, he will possess much additional wisdom to ruminate over. Thus shall you make yourself respected in all the walks of life, and your spirit—your *immortal* spirit—shall live, not in an intangible paradise, but in the brains and sinews of those whose respect you have gained. (p. 33, italics in original).

The seven deadly sins of the Christian Church are: greed, pride, envy, anger, gluttony, lust, and sloth. Satanism advocates indulging in each of these "sins" as they all lead to physical, mental, or emotional gratification. (p. 46).

Satanism encourages its followers to indulge in their natural desires. Only by so doing can you be a completely satisfied person with no frustrations which can be harmful to yourself and others around you. Therefore, the most simplified description of the Satanic belief is: INDULGENCE INSTEAD OF ABSTINENCE[.] (p. 81, emphasis in original).

The only time a Satanist would perform a human sacrifice would be if it were to serve a two-fold purpose; that being to release the magician's wrath in the throwing of a curse, and more important, to dispose of a totally obnoxious and deserving individual.... The question arises, "Who, then, would be considered a fit and

---

**6.** Marloe Karlin has been employed by the ODRC since 1977. His present position is Administrator, Religious Services. He is also an ordained Lutheran minister. His affidavit is found as Appendix A to the Motion.

**7.** Other publications which are prohibited are *The White Man's Bible, Chick Publications,* and various anti-semitic publications of the Nation of Islam. Karlin Aff., ¶ 5.

**8.** Exhibit J to plaintiff's deposition shows the PSC's recommendation with respect to plaintiff's cellmate's request to have *The Satanic Bible*. Apparently plaintiff was told that this decision also applied with equal force to his request for the same publication.

**9.** A copy of the official decision communicated to plaintiff's cellmate is found at Exhibit L to plaintiff's deposition.

proper human sacrifice, and how is one qualified to pass judgment on such a person?" The answer is brutally simple. Anyone who has unjustly wronged you—one who has "gone out of his way" to hurt you—to deliberately cause trouble and hardship for you or those dear to you. In short, a person asking to be cursed by their very actions. (pp. 88–89).

Intense sexual feeling should accompany this step of the [sexual] ritual, and after sufficient imagery is obtained, as strong an orgasm as is possible should serve as climax to this step. This climax should be attained using any masturbatory or autoerotic means necessary. (p. 132).

Intense, calculated hatred and disdain should accompany this step of the [destruction] ceremony, and no attempt should be made to stop this step until the expended energy results in a state of relative exhaustion on the part of the magician. (p. 134).

These representative quotes illustrate the potential for disruption in a prison setting if an inmate who was a practicing Satanist took these "teachings" to heart. There is nothing in *The Satanic Bible* to suggest that these directives are not to be taken literally and it requires little imagination to project the probable result of espousing the philosophy promulgated in this publication.[10]

Plaintiff attempts to argue that as long as an inmate is not a Satanist, he is allowed to have Satanic publications. He presents the affidavit of Robert Minniefield, another inmate at Lor.C.I., who attests that he has been given permission to have two Satanic publications, *The Devil's Notebook* and *The Satanic Witch*. Minniefield Aff., ¶ 12.[11] Minniefield claims to be a follower of WICCA, which he characterizes as "somewhat similar" to Satanism. *Id.*, ¶¶ 12–13. Even if

these assertions are true, they are not relevant to plaintiff's case, since his claim is that he is deprived of his right to possess *The Satanic Bible*. Even a liberal reading of plaintiff's complaint would not permit a conclusion that he is claiming generally that he is prohibited from having any Satanic publication or that he ever sought and was denied permission to have these other two publications.[12]

This case is about a very narrow issue: whether there are legitimate penological reasons for prohibiting the plaintiff from possessing *The Satanic Bible*. The Court concludes that there are. The Court draws no conclusion regarding whether the prison ever can or should completely prohibit the practice of Satanism, since that has not been made an issue in this case. Here, all that is concluded is that prohibiting the possession of *The Satanic Bible* does not substantially burden the plaintiff's ability to practice his "religion" and is validated by legitimate penological concerns for safety and security.

For the reasons discussed above, presuming for purposes of this motion that Satanism is a religious belief protected by the First Amendment and that this plaintiff sincerely holds to this belief, the Court nonetheless concludes that it is not a violation of the First Amendment to prohibit the plaintiff from possessing a copy of *The Satanic Bible* because there are legitimate penological interests which validate this prison policy. Accordingly, defendants' motion for summary judgment on plaintiff's First Amendment claim is granted.

### B.   The Fourteenth Amendment Claim

Plaintiff's Fourteenth Amendment claim is quite simple: he asserts that his right to equal protection has been violated

---

**10.** The realistic implications for the prison setting of a life driven by the practice of Satanism are well-expressed in a series of affidavits filed by the defendants in support of their motion. *See* Appendix to Defendants' Motion for Summary Judgment, Appendices A, B, C, and D. These affidavits are uncontroverted by the plaintiff except that he asserts that in the past, when he was in possession of a photostatic copy of *The Satanic Bible,* he neither experienced any difficulties from other inmates, although they knew he was a Satanist, nor caused any trouble himself.

**11.** Minniefield's affidavit is located in the appendix to plaintiff's memorandum in opposition to the motion for summary judgment.

**12.** Since there is no such allegation in the complaint, it would be an abuse for this Court to rewrite the complaint so as to encompass a new claim not stated by the plaintiff.

because he has been denied possession of *The Satanic Bible* while proponents of other religions are allowed to possess their sacred texts.

In view of the lengthy discussion above, the Court concludes that the same basic reasoning applies. "There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence." *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 136, 97 S.Ct. 2532, 2543, 53 L.Ed.2d 629 (1977). Furthermore, "prison officials, when making these types of decisions, need not demonstrate an *actual* danger in order to support the reasonableness of their determinations. It is enough to show that a *potential* danger exists without the restrictions of a challenged prison regulation." *Brown v. Johnson,* 743 F.2d 408, 413 (6th Cir.1984) (emphasis in original).

Accordingly, because the restriction at issue here is reasonably related to legitimate penological concerns, it is not a violation of plaintiff's Fourteenth Amendment right of equal protection. Defendants' motion for summary judgment is granted as to plaintiff's Fourteenth Amendment claim.

### *IV. CONCLUSION*

For the reasons discussed above, defendants' motion for summary judgment (Docket No. 29) is granted. Further, pursuant to 28 U.S.C. § 1915(a), the Court certifies that an appeal from this decision *could* be taken in good faith, permitting plaintiff to proceed on appeal *in forma pauperis.*

IT IS SO ORDERED.

### *JUDGMENT ENTRY*

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Judgment Entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that defendants' motion for summary judgment is granted. Further, pursuant to 28 U.S.C. § 1915(a), the Court certifies that an appeal from this decision could be taken in good faith, permitting plaintiff to proceed on appeal *in forma pauperis.* Case closed.